UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SENESCO MARINE, LLC,
Plaintiff,
VS. C.A. NO. 07-343T
HUNT MARINE I, LLC,
Defendant.

The deposition of KEVIN HUNT, taken pursuant to the Federal Rules of Civil Procedure on June 25, 2008, by the Plaintiff at the offices of Finan & Grourke, 24 Spring Street, Pawtucket, Rhode Island, commencing at 11:30 a.m., before Theresa A. Mullaugh, RMR, Notary Public.

APPEARANCES:

KENNY, STEARNS & ZONGHETTI, LLC
BY: GINO A. ZONGHETTI, ESQ.
Counsel for Plaintiff

CLINTON & MUZYKA, P.C.
BY: ROBERT E. COLLINS, ESQ.
Counsel for Defendant

ALSO PRESENT: Gayle Corrigan

REPORTING ASSOCIATES
10 Dorrance Street, Suite 617
Providence, RI 02903
(401) 351-1660

1 - Defendant's Answer to Plaintiff's Complaint and Counterclaim Against Plaintiff 10
2 - Affidavit of Kevin Hunt dated May 70
2 , 2008
3 - Senesco Invoice dated 4/4/2007 to Hunt Marine Towing & Transportation 84
4 - Document entitled, "2007 Standard Diary, Daily Reminder" 98
5 - Four pages of logbook for Patrick J. Hunt, dated May 21, 22 and 23, 2007 107
6 - Payroll document for Tug Patrick J. Hunt for week ending 27 May '07 110
7 - Seven pages of logbook for Patrick 111



12 - Invoice from Marine Filtration Services, Inc., dated 8/17/07 202
13 - Invoice from Seaport Communications Co., dated 9/21/07 203
14 - Invoices from Hunt Marine I, LLC, to ACE Insurance Co. 205
15 - Invoice from Senesco to Hunt 213



2 and 3, 2007
8 - Copy of phone records for Hunt Marine I, LLC, Invoice dated April 28, 2007 145
9 - One-page color-coded telephone log dated April 15 and April 16 170
10 - Invoice from D.N. Kelley & Son, Inc., Shipyard dated 10/02/07, Page 1 200
11 - Invoice from D.N. Kelley & Son, 201



Marine Towing & Transportation, dated 4/18/07

KEVIN HUNT, first having been duly sworn, was examined and testified as follows:

EXAMINATION BY MR. ZONGHETTI

Q. Would you state your name?
A. Kevin Michael Hunt.
Q. Where do you reside?
A. 51 Little Woods Path, South Kingstown, Rhode Island.
Q. How long have you lived there?
A. About five months.
Q. And what's located there? Is it a house?
A. It's a townhouse.
Q. Are you involved at all with a company, Hunt Marine I, LLC?
A. Yes, I am.
Q. What is your involvement with that company?
A. I'm the owner.
Q. What does that mean? That's a limited liability company; is that correct?
A. That's correct.
Q. And are you the owner of all the units or shares of that company?
A. I'm the owner.
Q. Do you have any partners in that company?
A. Yes, I do.



Q. Who are your partners?
A. A fellow by the name of Jack Cunniff.
Q. Any other partners?
A. No, sir.
Q. And what is his share of that company?
A. Twenty percent.
Q. Twenty percent; is that correct?
A. (Witness nodding head affirmatively).
Q. You have to answer.
A. Yes, sir.
Q. And does that mean you, Kevin Hunt, own 80 percent?
A. That's correct.
Q. And do you have any positions in the company aside from being the owner? Do you have any titles or positions or --
A. Just president.
Q. So you're president of Hunt Marine I, LLC?
A. That's correct.
Q. And for how long have you been president of Hunt Marine I, LLC?
A. Since day one.
Q. When is that?
A. I believe it was October 1st, 2001.
Q. And has Hunt -- Jack Cunniff been a partner since



day one?
A. Yes, sir.
Q. Have you had any other partners in the business?
A. Yeah, we did.
Q. Who was that?
A. Rich Nicholson.
Q. When was he a partner?
A. In the beginning for about a year, a year and a half.
Q. What happened with him?
A. He was bought out.
Q. By whom?
A. By the company, Hunt Marine.
Q. Well, he owned -- he owns some number of units in the company or shares?
A. He owns 20 percent.
Q. And where did his 20 percent go to? Did you obtain any of it?
A. All of it.
Q. Did you buy him out or the company bought him out?
A. The company bought him out.
Q. The company, Hunt Marine I, LLC, bought out Mr. Nicholson, and you ended up with all his stock?
A. Yes, sir, that's correct.



Q. And where is Hunt Marine I, LLC, incorporated?
A. Well, we have a mailing address and our office in Warwick.

MR. COLLINS: I think he's asking you what state.

MR. ZONGHETTI: Yeah.

A. Narragansett, Rhode Island.
Q. What state is the business incorporated in?
A. Narragansett, Rhode Island.
Q. So it's a Rhode Island corporation?
A. Yes, sir.
Q. And does the company presently own any tugboats?
A. Yes, sir.
Q. How many tugboats?
A. Three.
Q. What are the tugboats it owns?
A. Patrick J. Hunt.
Q. All right.
A. Hunt Girls.
Q. All right.
A. Charlene Hunt.
Q. And are they presently -- do they presently have a location where they dock each day?
A. Well, yes, they do.
Q. Where is that?

A. Conley's Wharf, Providence.
Q. And does Hunt Marine I, LLC, pay wharfage to anyone at Conley's Wharf?
A. No, sir.
Q. Well, they dock there for free?
A. No. It was an agreement. I bought -- I bought some barges off of him. It was part of the agreement of buying the barges.
Q. You bought barges from whom?
A. The owner, Patrick Conley.
Q. And as part of the agreement when you, meaning Hunt Marine I, LLC, bought these barges as part of that agreement, entitled Hunt Marine to dock some tugs at the wharf?
A. Yes, sir.
Q. For how long did you get dockage?
A. It really wasn't specified.
Q. For how long have you had tugs docked at this wharf under this agreement?
A. Since last October.
Q. October 2007?
A. That's correct.
Q. From April of 2007 until October of 2007 where were -- when I say your tug, I mean Hunt Marine I, LLC's tugs. Do you understand that?



A. Oh, yeah.
Q. Where were the tugs docked?
A. Fairhaven Shipyard. Patrick J. was in Fairhaven Shipyard. I believe she was there from May 2007 to the end of September 2007. Charlene was tied up at Hinckley's Yacht Yard in Portsmouth, Rhode Island, from April to August. After that she was docked at Kelley's Shipyard, Fairhaven, Mass.
Q. What about the Hunt Girls?
A. Hunt Girls was working.
Q. For the Patrick or the Charlene from April to October 2007, did you have to pay for any dockage?
A. No.
Q. And since October 2007 for each of the tugs, the Hunt Girls, the Charlene, and the Patrick, the dockage that you've obtained for those vessels has come through this deal where you bought barges from Conley?
A. That's correct, sir.
Q. What barges did you buy? How many barges did you buy?
A. Two barges, two 30-by-90s.
Q. And what type of barges are they?
A. Steel deck, flat-deck barges.
Q. What are they used for?



A. Rental for marine construction.
Q. Is that something that Hunt Marine does, it rents out barges?
A. Yes, sir.
MR. ZONGHETTI: Let's mark this.
(Plaintiff's Exhibit 1 for I.D.: Defendant's Answer to Plaintiff's Complaint and Counterclaim Against Plaintiff)
Q. I'm going to show you what's been marked as Exhibit 1, which is the Answer of Hunt Marine I, LLC, to the Complaint that was filed in this case by Senesco. And I'm going to ask you to take a look at it, please.
(Witness complies).
Q. Mr. Hunt, you're certainly entitled to read it. I'm going to ask you a few questions directed to certain parts of it. So if you want to continue reading it, that's fine. If you want me to move onto the questions just to move this thing along, that's fine, whatever you want to do.
A. You can start asking questions.
Q. All right. Just one question off of this document. This agreement with Conley, which involved the dockage for the tugs, was that something that was in writing? Was it an oral



agreement?
A. Oral.
Q. The document that I put in front of you, the Defendant's Answer to Plaintiff's Complaint, do you understand what that is, sir?
A. The answer –
Q. The document I put in front of you –
A. Yes.
Q. -- it's entitled Defendant's Answer to Plaintiff's Complaint. Do you understand what that is?
A. Yes.
Q. Do you understand that that was a document that was filed on behalf of Hunt Marine I, LLC, by your attorneys in this lawsuit?
A. Yes, sir.
Q. And I assume that you authorized your attorneys to file this on behalf of Hunt Marine I, LLC?
A. Yes, sir.
Q. And prior to authorizing your attorneys to file this, I assume you met with your attorneys and went through the allegations in the Complaint that had been filed by Senesco?
A. Yes, sir.
Q. Go to page 2, which is paragraph 7. Do you see that, sir?

A. Yes.
Q. All right. In that paragraph you indicate defendant admits in 2000 Hunt Marine began docking the Tug Charlene Hunt and Patrick Hunt at Senesco's Carrier Pier. Do you see that?
A. Yes.
Q. Yes?
A. Yeah, it's wrong.
Q. What is wrong about that?
A. The year.
Q. What year -- what would you -- what would you want to change in that paragraph to correct it?
A. I believe it's 2001.
Q. So aside from the date, 2000 being changed to 2001, is that line correct?
A. Which line?
Q. The line I just read.
A. Can you read it again?
Q. Defendant admits that in 2000, which we're changing to 2001 as per your suggestion, Hunt Marine began docking the Tug Charlene Hunt and Tug Patrick J. Hunt at Senesco's Carrier Pier.
A. The Patrick J., not the Charlene. Didn't have the Charlene then.
Q. Okay. So in 2001 did Hunt Marine begin docking



the Patrick at the Senesco Carrier Pier?
A. No. No, I didn't.
Q. All right. What else has to be changed?
A. Well, I can explain it. Do you want me to explain it?
Q. Go ahead.
A. We came to an agreement with Senesco. I owned the Captain Tom, and the agreement was to dock the Captain Tom there. But then we left for a year, went to work on a pipeline job up in Boston. And I don't believe we bought the Patrick J. till 2003. So the first year and a half to two years at Senesco we were in agreement, but we weren't there.
Q. Okay. In 2003 did you start docking any of your vessels --
A. Yes.
Q. -- at the Senesco Carrier Pier?
A. Yes, the Patrick J.
MR. COLLINS: Let him finish the question before you start answering.
THE WITNESS: Okay.
Q. What, if any, agreement was there in place regarding dockage of the Patrick J. at Senesco's Carrier Pier starting in 2003?



A. Same agreement I had from day one.
Q. Which was what?
A. It was a barter system. I would shift any equipment that needed to be shifted around the Carrier Pier for dockage.
Q. Who was that agreement made with?
A. Bob Jarvis.
Q. And what was his position with Senesco?
A. I believe president at the time.
Q. The Patrick J. was purchased by Hunt Marine in about 2003?
A. I believe so.
Q. And from whom was it purchased?
A. A gentleman named Tony Savas.
Q. Tony Savas?
A. Yes, he owned a company named Petchem.
Q. And what was it purchased for?
A. $950,000.
Q. And what was the Patrick J. used for? What type of work was it used for by Hunt Marine, LLC, starting in 2003?
A. General harbor work, marine construction.
Q. So the agreement that Hunt Marine had with Bob Jarvis, who was at the time, according to your belief, the president of Senesco, was that the



Patrick J. could be docked at the Senesco Carrier Pier in exchange for work that the Patrick would perform moving equipment around?
A. That's correct, sir.
Q. And did that mean that Hunt Marine did not pay for dockage per se by issuing a check to Senesco; it received dockage but was expected to do whatever work might have been asked of it?
A. Only at the Carrier Pier.
Q. Was there work that Hunt Marine performed for Senesco that it was paid for starting in 2003?
A. Yes.
Q. What type of work was Hunt Marine paid for that it performed for Senesco?
A. The launchings of the new barges.
Q. So in instances where Senesco Marine or Senesco launched a new vessel and Hunt was engaged, it would be paid?
A. That's correct.
Q. And this barter system applied with respect to movement of equipment around the Carrier Pier?
A. That's all.
Q. So if, for example, Senesco was repairing a vessel at the Carrier Pier, and it needed to be moved, would that be the type of activity that would be

Page 16

part of the barter system?
A. Moved to where?
Q. Around the pier.
A. Yes, that's correct.
Q. But moved somewhere else would not be involved?
A. That's correct.
MR. COLLINS: Movement by tug.
MR. ZONGHETTI: Movement by tug.
MR. COLLINS: You wouldn't actually move the boat, operate the boat to move it.
THE WITNESS: Yeah, we used the tugs.
MR. COLLINS: Okay.
Q. What was involved here was the Hunt Marine tug, the Patrick J., would put a line out to whatever vessel and move it along the pier?
A. That's correct.
Q. Now, if we go back to paragraph 7, it says defendant also admits that in March of 2007 it began paying Senesco on a monthly basis for dockage of the Tugs Charlene and Patrick J. Hunt to the Carrier Pier. Do you see that?
A. Yes, sir.
Q. Is that line correct?
A. I'm not sure.
Q. Can you explain that, your answer?

Page 17

A. I don't know if it was earlier. I don't know if it was February.
Q. So with the exception of the month, whether it was February 2007 or March 2007, did it occur that Hunt Marine started paying for dockage at Senesco?
A. That's correct.
Q. How did that agreement come about?
A. Through a meeting.
Q. Did you meet with someone?
A. Yes.
Q. Who did you meet with?
A. Mike Foster and Craig Reinauer.
Q. Who was Mike Foster?
A. President of Senesco.
Q. Mike Foster is the president?
A. I believe so.
Q. And who is Craig Reinauer?
A. I believe he is the owner.
Q. When did this meeting take place?
A. I believe it was in January of 2007.
Q. And where did it take place?
A. Senesco's headquarters.
Q. Quonset Point?
A. Correct.
Q. And what was discussed at this meeting?

Page 18

A. Basically I knew Senesco had purchased -- excuse me. I knew that Reinauer had purchased Senesco, and I wanted to introduce myself and make sure I still had a place to keep my equipment. And that's basically what the meeting was about.
Q. So did you call for this meeting?
A. Yes, I did.
Q. And you introduced yourself at this meeting, and you inquired about whether you could keep your equipment at this Carrier Pier?
A. Correct.
Q. And what equipment did you have at the Carrier Pier at that point in time?
A. I don't believe any.
Q. All right. Well, were you docking on an ongoing basis or sporadic basis there?
A. Very simple. One thing we tried not to do is have the tugs in Rhode Island. We want to be working. So we try not to have the tugs at docks.
Q. And why do you try not to have the tugs at docks?
A. Because we prefer the vessel is working.
Q. So if they're out working somewhere, they don't have to dock?
A. New York, Baltimore, Philadelphia, Hudson River, wherever we're at, you know, we're working for a

Page 19

company, that's where we prefer to be.
Q. If you're working, you're obviously getting paid?
A. That's correct.
Q. You have your crews employed?
A. That's correct.
Q. You don't have a dockage expense, if you can avoid it, while it's working?
A. That's correct.
Q. And those would be reasons that you prefer to have your vessels working; is that correct?
A. Absolutely.
Q. Am I correct that Hunt Marine does not have its own yard? And by that I mean a facility where it could bring its tugs in, dock them, that type of thing.
A. As of when?
Q. Has it ever had its own yard?
A. No. We started at Senesco. And until that day in April we were always there.
Q. When you say we started at Senesco, are you saying that Hunt Marine started tying up its tugs at Senesco when they were in Rhode Island?
A. That's correct.
Q. And this was initially as a result of the barter system?

Page 20

A. Yes, sir.
Q. And then in January 2007 or about that time you had a meeting with Mr. Foster and Mr. Reinauer and some other - some other agreement was reached as to dockage?
A. That's correct.
Q. And you were part of that meeting, right?
A. Yes, sir.
Q. And were you informed at that meeting that the new Senesco that had been purchased by Reinauer was no longer interested in this barter system?
A. That's correct.
Q. And that from that point forward there would have to be a dockage fee assessed to Senesco for its tugboats?
A. After two weeks.
Q. So from the time of the meeting Mr. Reinauer and/or Mr. Foster indicated to you that you would have two weeks without having to pay and that thereafter dockage would be assessed?
A. Yes. Mr. Reinauer.
Q. And Mr. Reinauer indicated to you that dockage would be assessed on a linear-foot basis; is that correct?
A. That's correct.

Page 21

Q. And what does that mean, if you can explain?
A. Well, if you -- if the boat is a hundred feet long, and it takes up a hundred feet of the dock, you get charged a hundred feet.
Q. A hundred feet at a particular rate per day?
A. Yes, sir.
Q. Is that how it worked?
A. That's how it worked.
Q. You understood that was what was being offered to Hunt Marine; is that correct?
A. Yes.
Q. Was that something that you accepted at the meeting?
A. Yes, sir.
Q. What was the rate per linear foot that was offered?
A. I don't want to give the wrong answer, so I don't know.
Q. Whatever was offered, was there an agreement reached as to rate that day?
A. Yep.
Q. Yes?
A. Yes, sir.
Q. And did that mean that Hunt Marine agreed that when it had a tugboat in there against the dock,

Page 22

it was going to pay per linear foot based upon the rate that was agreed to?
A. Yes, sir.
Q. When you left that meeting, were you clear that that was what was to occur?
A. Yes, lineal feet.
Q. And you were familiar at that point in time, January 2007, with the Senesco pier, the Carrier Pier, correct?
A. Yep. Yes, sir.
Q. You were aware of its condition; is that also correct?
A. Yes, sir.
Q. You had been there since at least 2001, in and out of there with your tugboats; is that correct?
A. That's correct.
Q. And knowing the state of the pier, the condition of the pier for at least six years by that point in time, the time of this meeting, you agreed to continue to dock your tugs there and to pay linear-foot rate when you docked your tugs there; is that all correct?
A. That's correct.
Q. Were you assigned -- you meaning Hunt Marine I, LLC -- any particular slot on the pier for any of

Page 23

your tugboats?
A. Yes, we were.
Q. Okay. When did - when did this assignment take place? Was it at this January '07 meeting?
A. No.
Q. No?
A. No, sir.
Q. So at the meeting there was no instruction to you that your tugboat or tugboats were to take up a particular section of the pier?
A. No, sir.
Q. That's correct?
A. That's correct.
Q. When do you claim this assignment took place?
A. Right in the beginning of our agreement.
Q. January '07?
A. No, sir.
Q. February '07?
A. I think it was more October 2001.
Q. Okay. This is going back to when you had this barter agreement with Mr. Jarvis?
A. Yes, sir.
Q. And what were you told with respect to where the Hunt tug -- at that time was what, the Thomas?
A. Captain Tom.

Q. Captain Tom. What were you told about where the Captain Tom should dock?
A. I wasn't told. I made a suggestion.
Q. Why don't you explain to me what happened, sir.
A. I made a suggestion, why don't I go across on the northern pier, a pier they don't use, and I would be out of everybody's way.
Q. And who did you suggest this to?
A. I believe it was Red Warren.
Q. Rick Warren?
A. Red.
Q. And he's someone that worked at Senesco?
A. Yes, sir.
Q. So you took a look at the dock; you had some experience with the facility; and you suggested that perhaps you would keep your tugboat on the northern face of the Carrier Pier, the northern dock? Is that how you explained it?
A. No.
Q. Okay. Explain it. I'm sorry.
A. I can draw it a lot easier.
Q. No, that's okay. We can talk.
A. It's not on the Carrier Pier at all. It's across from the Carrier Pier.
Q. Okay. So it would be the dock north of the



Carrier Pier?
A. That's correct.
Q. Across the little body of water there?
A. That's correct.
Q. Was that something that was controlled by Senesco at the time?
A. Yes, that's correct.
Q. Okay. And is that where you kept the - whatever boat you brought in under the barter agreement with Senesco for some period of time?
A. Ninety percent of the time.
Q. Now, in terms of this January '07 meeting with Mr. Reinauer and Mr. Foster, there was no discussion about where the boat or boats were to be kept; is that correct?
A. No, sir.
Q. Yes?
A. No, sir.
Q. What was the discussion?
A. Of the wharfage fee.
Q. That was discussed. But in terms of where the boats were supposed to be tied up, was that discussed?
A. No, sir.
Q. Was there any discussion after that point in time



with anyone at Senesco as to where the tugs for Hunt Marine were supposed to be tied up?
A. No, sir.
Q. Did you continue to tie them up in an area where you had traditionally tied them up?
A. Well, we would tie them up across, on the Carrier Pier when we plugged in the refrigerator, 110, or if we had work to do to the tugs, or we hired Senesco to do the work for the tugs.
Q. So if the tugs -- if the Hunt Marine tugs were at the Senesco facility, and you needed to plug in a refrigerator, you would tie up to the north face of the Senesco pier, Carrier Pier?
A. Carrier Pier, that's correct.
Q. Or if work was being performed by Senesco on a tug, you would similarly tie up there?
A. Yes.
Q. If neither of those things were being done, if you weren't plugging in and if work wasn't being done, where would the tugs tie up?
A. On the north -- on the -- across, that area we talked about.
Q. And at this meeting of January '07 did you have any understanding as to how many tugs you could dock at Senesco's pier?



A. No, sir.
Q. Was that discussed at all?
A. No, sir.
Q. Did you have any understanding that if you brought two tugs in and breasted them, you would only be charged dockage for one tug?
A. My understanding was lineal feet.
Q. And what does that mean with respect to the question I just asked?
A. The tug is a hundred feet, you take up a hundred feet of the dock, and you're charged a hundred feet.
Q. So that would mean your belief was that if you brought in, for example, the Patrick --
MR. COLLINS: Let him finish the question.
Q. You brought in, for example, the Patrick, which is 80 feet in length; is that correct?
A. That's correct.
Q. That you would be charged as per the linear foot rate for the Patrick; is that correct?
A. That's correct.
Q. And that would be 80 feet times whatever the rate was?
A. That's correct.
Q. Times the number of days; is that correct?

Page 28

A. That's correct.
Q. And that if you brought in, for example, the Charlene, and breasted the Charlene to the Patrick, that that, as per your belief, should not count towards the dockage fee?
A. That's correct.
Q. And that would be because your belief was that it was not taking up any linear footage along the dock?
A. That's correct.
Q. Was that discussed at the meeting with Mr. Reinauer and Mr. Foster?
A. No. No, sir.
Q. So that was something that was your belief that was not discussed at this meeting with the owner of Senesco and the person you believe was the president, correct?
A. That's correct.
Q. And this would have been the first agreement that you had with Senesco where Hunt Marine actually had to pay out, meaning money instead of barter, for dockage, correct?
A. That's correct.
Q. At this meeting did you envision bringing in more than one tug at a time to the Carrier Pier?

Page 29

A. I was hoping not to bring any in.
Q. That's the hope, because you want your tugs working and you want them making money. When they're down, that's an expense to your company, right?
A. That's correct, sir.
Q. But, you know, hope springs eternal, as they say. And the reality is that you have time, and you know this, that your tugs are down, right?
A. That's correct.
Q. And the question was did you envision bringing in more than one tug at a time?
A. It's hard to say. Envisioned it?
Q. Yeah.
A. I guess I could envision it, yeah.
Q. Did -- given that, did you discuss that with anyone at Senesco?
A. No. No, sir.
Q. Were you -- ultimately, there came a point in time when you were billed for more than one tug at the dock by Senesco -- I'll withdraw that -- for more than one tug for dockage at Senesco; is that correct?
A. Repeat the question, please?
Q. Ultimately -- and we'll get into this

Page 30

specifically. But ultimately, you received at least one bill, perhaps more, for dockage fees for more than one tug at Senesco's Carrier Pier; is that correct?
A. I believe one tug.
Q. Okay. Well, we'll get back to that one.
In addition to paying for the dockage at the Senesco pier, was there any talk about payment to Senesco for work that it might do on your tugs when they were at the pier at this January 2007 meeting?
A. Payment?
Q. Yeah. I mean, in addition at times Senesco might perform work or give assistance to Hunt in performing work on the tugs?
A. Right.
Q. Was that discussed at all at this meeting of January 2007?
A. No, not at the meeting, no.
Q. There was no barter agreement with respect to repair --
A. No, sir.
Q. -- services that Senesco Marine might pay?
A. They did work. We paid them.
Q. And the sole discussion that took place at this

Page 31

January '07 meeting was with respect to dockage; is that correct?
A. Yes.
Q. And the understanding always was that if Senesco did work, it would be paid for that work, correct?
A. That's correct.
Q. Now, what Senesco was providing was exclusively a space on the dock, right?
A. Yes.
Q. And was it your understanding that if, for example, Senesco's dock happened to be filled, if they had vessels there they were servicing or what have you, that you might not have a space at the dock, or were you guaranteed a space at the dock?
A. No. Their business came first.
Q. So the agreement was that - and your understanding --
A. It wasn't an agreement.
Q. Your understanding of the situation was that if the dock was filled, you might not have a spot?
A. That's correct.
Q. Was there any discussion about Senesco tending your tugs' lines at this meeting?
A. No, sir.
Q. And that was something that Hunt Marine, when its

tugs were tied up at the Senesco, either the north pier or the Carrier Pier, was responsible for; is that correct?
A. That's correct.
Q. Hunt Marine crewed its vessels; is that correct?
A. That's correct.
Q. And Senesco Marine did not provide employees for Hunt Marine to crew its vessels, right?
A. No. That's not true either. I used to use some of Senesco's employees.
Q. Can you explain what you mean?
A. Well, if I came in -- I don't think it happened during our agreement while I was paying, but it happened quite a bit with the barter system.
I would come in myself, something happened, they need something moved, I would drive in. I didn't have a deckhand or anything because it was 2:00 o'clock in the morning. And I -- you know, I would ask Red, "Red, you gotta guy?" You know, they handled my ropes, my lines.
And I usually would request Silvio. And we would -- Silvio would act as my deckhand, yes. That happened quite a bit.
Q. By Silvio, you're talking about Silvio D'Amico?
A. Yes.



Q. And he was a Senesco employee?
A. That's correct.
Q. But he was an employee initially of the old Senesco, right?
A. Yes, sir.
Q. And are you -- is what you're saying, that you would bring your tug in; you would be looking to tie up at the dock?
A. No, sir.
Q. Okay. What are you talking about? If something needed to be moved, if a piece of equipment needed to be moved, and you didn't have a deckhand, that Senesco would allow you to use its employees?
A. That's correct, sir.
Q. To help out?
A. That's correct, sir.
Q. But in that circumstance Senesco would be getting a benefit from what you were doing, right?
A. That's correct, sir.
Q. And they would allow one of its employees to assist you?
A. That's correct, sir.
Q. You didn't pay the employee, right?
A. No, sir.
Q. And Senesco didn't charge you in that



circumstance?
A. No.
Q. That was purely the barter system, right?
A. Yes, sir.
Q. And it was kind of like one hand was helping the other?
A. That's correct, sir.
Q. That changed in January '07, right?
A. Yes, sir.
Q. After January '07, I believe you just said it, there was no circumstance where you used the Senesco employees?
A. I don't believe so.
Q. After January '07, you mentioned that you -- at that meeting you dealt with Mr. Foster and Mr. Reinauer.
Were there other management-level employees that you were familiar with at Senesco at that point in time?
A. Yes.
Q. And who was that? Who were they?
A. Gayle.
Q. Gayle was the chief financial officer; is that correct?
A. Yes.



Q. And you dealt with her in terms of billing-type issues?
A. Yes.
Q. Who else might you deal with?
A. I basically knew everybody at Senesco.
Q. Okay.
A. I'm a good guy.
Q. Okay. Down at the dock were there management-level employees or supervisory-level employees that you dealt with?
A. Yes.
Q. Who were they?
A. Managed the dock first was Red Warren.
Q. He wasn't there in '07 though, was he?
A. No. Steve Tholander was.
Q. And he was managing the dock at that point in time?
A. Yes, sir.
Q. Do you know what his title was for Senesco?
A. No, sir.
Q. But you recognized him as the supervisor or manager of the dock?
A. Yes, sir.
Q. And he was someone, if you had to deal with a management-level employee or supervisory-level

Page 36

employee at the dock during this period of time, it would be Steve Tholander?
A. That's correct, sir.
Q. Was there anyone else in that category that you would deal with at the dock at that point in time?
A. In what aspect?
Q. In any aspect.
A. I might ask Greg for something.
Q. Greg who?
A. I don't know Greg's last name.
Q. Okay.
A. Or Ziggy.
Q. Well, that's William Ziegler?
A. Yes.
Q. William Ziegler was what? What did he do on the dock?
A. Worked on it.
Q. He was a guy who worked on the dock?
A. I didn't know his position. I just know he worked on the dock.
Q. How long did you know Mr. Ziegler for?
A. About five years.
Q. You didn't believe he was a management-level employee, right?
A. No, I didn't.

Page 37

MR. ZONGHETTI: Is it Greg Daum?
MS. CORRIGAN: Daum, D-A-U-M.
Q. Does that sound familiar to you, Greg Daum?
A. I didn't know his last name.
Q. Okay. What did he do on the dock?
A. He did everything on the dock.
Q. Was he a manage -- did you recognize him as a management-level employee?
A. No. But he was the boss of all the other guys.
Q. Was he there in '07?
A. Yes, he was.
Q. Was -- did you recognize him as boss of Mr. Ziegler?
A. Yes.
Q. You've been around the dock long enough to realize there's a certain hierarchy; is that correct?
A. That's correct.
Q. And you would have Tholander. And below him in the chain would be Daum?
A. It was close.
Q. But certainly below both of them was Ziegler?
A. Oh, yeah, absolutely.
Q. And Ziegler was a guy who was working on the dock, right?
A. Yeah.

Page 38

Q. Did you have the authority to direct any Senesco employee to do anything?
A. Absolutely not.
Q. Did you have the authority to hire any Senesco employee to do anything?
A. Absolutely not.
Q. If you needed some sort of -- or if you sought some sort of change in the dockage agreement, for example, who was it that you would have spoken to? Would it have been Mr. Foster, or Mr. Tholander, Mr. Reinauer?
A. It would have been Steve.
Q. Steve Tholander?
A. (Witness nodding head affirmatively).
Q. Is that correct?
A. Yes, sir.
Q. Now, am I correct that in sort of the context of the tugs being at the dock being not the most desirable state for your business in terms of economics, that when they were at the dock, Hunt Marine sought to minimize any services it had to pay for; is that a fair statement?
A. Yes, sir.
Q. So, for example, you would avoid paying, if you didn't have to, for a line handler or for a piece

Page 39

of equipment, if possible; is that all correct?
A. I wouldn't -- can you restate that?
Q. Yeah. I mean, you had your own crews when the boats came in, right?
A. Yep.
Q. Correct?
A. Yes.
Q. And they handled the lines?
A. Yes, sir.
Q. And they would tend the lines, right?
A. Yes.
Q. And you weren't about to pay for a Senesco employee to tie or attend the lines if you didn't have to, right?
A. That's correct, sir.
Q. And that would be the same if you needed something moved along the dock; if it was something your crew could do, they would move it, right?
A. That's correct.
Q. And you wouldn't pay for a crane or a forklift unless you really had to?
A. Correct.
Q. All correct?
A. That's correct.
Q. Just sound business, right?

A. (Witness nodding head affirmatively).
Q. Correct?
A. That's correct.
Q. If you go to page 8 in the Complaint - or in the Answer, rather, I'm sorry, the document you have in front of you -- and I'm going to be jumping around a little bit -- if you look at paragraph 10 -- or actually, go to paragraph 9 to give it a little context. Do you see that, sir?
A. Paragraph 9?
Q. Yes.
A. Yes, sir.
Q. And that talks about 0200 hours on April 16, 2007, the Tug Charlene Hunt and the Tug Patrick Hunt broke loose from their berth and sustained damage. Do you see that?
A. Yes, sir.
Q. The next line, paragraph 10, says the Charlene Hunt sustained damage in excess of $200,000. Do you see that?
A. Yes.
Q. Is that line, that line right there correct?
A. I don't know, sir.
Q. Well, can you explain your answer?
A. I'm not a marine surveyor.



Q. Well, this is your Complaint. This is your Complaint, this part of this document against Senesco. Do you understand that?
A. Yes.
Q. And I asked you, I believe, whether you authorized this being filed. You said yes, right? Is that correct?
A. Yes, sir.
Q. And you met with your attorneys; you authorized them to file this. And I assume they got the information from this Complaint from you, right?
A. Yes, sir.
Q. Okay. So you would be the historian for this; you would be the person --
A. Okay, I understand what you're saying.
Q. Okay. So let's get back to the original question. We're now in the year 2008, June 25th, a year after this event of -- a year plus after this event of April 16, 2007, right?
A. Yes, sir.
Q. Charlene has been repaired?
A. Yes, sir.
Q. Is that correct?
A. Yes, sir.
Q. You were involved in the --



A. Repairs.
Q. -- repairs, right?
A. Yes, sir.
Q. You know what it cost to repair these tugs, Patrick and the Charlene?
A. That's correct.
Q. There's documentation to that effect, right?
A. Yes, sir.
Q. Your insurance company was involved; is that correct?
A. That's correct.
Q. Is that number, $200,000, in excess of $200,000 correct?
A. I would say it's in the ballpark.
Q. Were repairs actually effected to the Charlene Hunt, performed?
A. Oh, yes.
Q. And where were these repairs done?
A. Kelley's Shipyard, Fairhaven, Massachusetts.
Q. Were they done anywhere else?
A. Yes.
Q. Where else?
A. On the drydock at Kelley's, and shoreside in the water at Kelley's, and then shoreside at Conley's.
Q. Okay. When were the repairs done?



A. I believe we started in August of 2007.
Q. And when were they completed?
A. I believe they were completed in November 2007.
Q. And the repairs that were done were covered by an insurance policy that Hunt Marine had with ACE Insurance Company; is that correct?
A. Not all the repairs.
Q. Okay. Did ACE pay out for any of the repairs?
A. Yes, sir.
Q. What did they pay out?
A. On the Charlene?
Q. Yeah.
A. I believe it was about $60,000.
Q. And the way it works, if I'm not mistaken, was ACE had an insurance -- I'll withdraw that. ACE had a surveyor come out, take a look at the damage; is that correct?
A. That's correct.
Q. Was that surveyor Kevin Clarke?
A. That's correct.
Q. He issued a survey to ACE; is that correct?
A. That's right.
Q. Did you get copies of the survey?
A. Yes, sir.
Q. And when he came out and looked at the tug

Page 44

Charlene, were you involved in that?
A. Yes, sir.
Q. After the surveys went out, you engaged a shipyard to do work on the Charlene to repair it?
A. That's correct.
Q. And that was with approval of ACE Insurance?
A. That's correct.
Q. And with Mr. Kevin Clarke's approval?
A. That's correct.
Q. Kevin -- the tugboat was brought into the shipyard in about August of '07; is that correct?
A. That's correct.
Q. And the shipyard period involved drydocking as well as shoreside work?
A. That's correct.
Q. And Mr. Clarke would have been involved in some level of supervision of what was going on, whether it was appearing at the shipyard once in a while to see what was going on?
A. That's correct.
Q. And the shipyard issued bills that were paid by ACE?
A. That's correct.
Q. And your belief is that that came out to about $60,000 in payments from ACE to the shipyard?

Page 45

A. I believe so.
Q. Now, is your suggestion -- since you said the $200,000 was in the ballpark of the damages sustained by the Charlene Hunt, is your suggestion that on top of what was paid by the insurance company Hunt Marine paid about $140,000 to repair the Charlene?
A. About a hundred.
Q. About a hundred; is that correct?
A. That's correct.
Q. So this $200,000 number is closer to $160,000; is that the case?
A. I'm trying to think about the shipyard, if there was more bills. I'm not positive on the shipyard's billing. It might have been more, but I know of 60.
Q. Well, did ACE reject any shipyard bills for the Charlene?
A. Not to my knowledge.
Q. Well, what you know of sitting here today, to your best recollection, are damages in the area of $160,000 to the Charlene; is that correct?
A. Yes, sir.
Q. And that would be as opposed to the $200,000 number that was in this Counterclaim in this

Page 46

exhibit we have in front of you; is that correct?
A. That's correct.
Q. Can you explain to me, first of all, what did this $100,000 that Hunt Marine -- that you claim Hunt Marine paid to repair the Charlene, what did that consist of?
A. Steel work.
Q. Where?
A. Tank work, steel work, fender work, painting, chipping.
Q. Where was this work done?
A. The majority was done at Kelley's, dockside.
Q. And who did this work?
A. About five guys down there, five or six guys.
Q. So is what you're saying that Hunt Marine actually hired people to do work on the Charlene while it was dockside --
A. Mm-hmm.
Q. -- at Kelley's?
A. That's correct.
Q. Is that correct?
A. Yes.
Q. And that work included tank work?
A. Yep.
Q. And what do you mean by tank work?

Page 47

A. Steel work to the tanks, steel that was bent, steel that was rotted.
Q. Okay. Rotted work because -- not because of this incident, April 17th --
A. Well, we had some bent steel.
Q. I'm not talking about bent steel. You just said rotted steel.
A. Right.
Q. Storm didn't cause rotted steel.
A. No.
Q. Correct?
A. That's correct.
Q. Was this work that ACE would not pay for?
A. Yeah, ACE was going to pay for it.
Q. Okay. Did they pay for it?
A. No.
Q. Can you explain what happened?
A. Well, ACE wanted -- you know, I explained to them that, you know, we're cutting up bulwarks; we're doing this; we're doing that. And they wanted pictures. They wanted documentation. They wanted all the bills. They wanted everything. And I just wanted to get the boat going.
Q. Okay.
A. Do you understand?

Q. Well, the insurance company would have a right to all that stuff, right?
A. Oh, absolutely.
Q. I mean, they would have a right to pictures of damage?
A. And they got them. We have them.
Q. Was there a dispute over --
A. No, it was really me that didn't submit them because they had spent so much money on the Patrick and so much damage on the Patrick, I wanted to keep my amounts low.
Q. You wanted to keep amounts that you submitted to your insurance company low?
A. Yes.
Q. Are you still with -- is Hunt Marine still with ACE?
A. Yes, it is, sir.
Q. This $100,000 that you claim, I mean, went into the Hunt Marine -- I mean went into the Charlene between August and November '07, that was not submitted to the insurance company, do you have -- do you have documentation of the work done, what was spent on it?
A. Roughly, I do, yes.
Q. Where is that documentation?



A. At my office.
Q. Have you given it to us?
A. I don't think you requested it.
MR. ZONGHETTI: I didn't request it?
A. Did you request it?
Q. I think we did.
MR. COLLINS: I would have to look. I gave what we had.
A. I don't know. Maybe we did. I don't know.
Q. Well, you're here. And I'm trying to find out. I mean --
A. Well, you also have to realize you're talking to a guy that's got -- you know, between 200 phone calls a day and everything else I do, you know. I'm a busy little beaver.
Q. Yeah, I guess no one else is busy. You're busy, and that gets in the way of complying with federal --
A. I'm just talking about my problems, not yours. I'm talking about mine.
Q. And you're on the phone all the time, right?
A. All the time.
Q. What do you have in your office that shows this $100,000 worth of work?
A. Payroll.



Q. Payroll to pay your guys working on the boats?
A. That's correct. Bills, steel yards, crane services.
Q. Well, obviously we're going to ask for that. I'm sure we've asked for it already. I'm going to ask for whatever you have that shows this $100,000.
A. Okay. No problem.
Q. Was any of this submitted to the ACE Insurance Company?
A. No, sir.
Q. So this is -- this $100,000, this claim is a claim that is - consists of work that was done by Hunt Marine, LLC, by individuals it hired?
A. Hunt employees.
Q. Hunt employees. Okay. It includes materials that Hunt bought; --
A. That's correct.
Q. – is that correct?
A. That's correct.
Q. It includes services it paid for? You mentioned a crane?
A. Yes, sir.
Q. Whose crane was that, Kelley Shipyard?
A. We used Kelley's a couple of times and got billed for it. Bluestar or Bluefish Welding, we hired



them several times. They had a boom truck.
Q. When did you purchase Charlene?
A. September 2006.
Q. And what did you purchase Charlene for?
A. $175,000.
Q. So the repairs that went into the Charlene of 160 just about equaled its purchase price?
A. I would say so, yes.
Q. Well, simple math would say so, right?
A. That's what I'm saying.
Q. How old -- when was the Charlene built?
A. She's an older single-screw tug. She was built I believe in '62.
Q. And do you know when, before you purchased the Charlene -- I'll withdraw that.
Did you drydock the Charlene at any point in time from September '06 until she went to the -- was it Kelley's?
A. No, sir.
Q. Did you do any repairs, any structural repairs or anything from the time you bought it until she went to Kelley's?
A. No, sir.
Q. Some amount of the work that was done on the Charlene from August to November '07 was repairing

Page 52

things that had rotted and things of that nature?
A. It was mostly stuff caused by the storm.
Q. Can you just focus on my question? Some amount was to replace rotted steel?
A. Yes, sir.
Q. Do you have photographs of everything you did?
A. I believe so.
Q. Is that in your office?
A. Yes. If I could?
Q. Yes.
A. When you say rotted steel, a lot of that rotted steel got bent.
Q. So you replaced bent rotted steel?
A. In some cases. I just want to make - clarify that.
Q. Right. But rotted steel in the tanks?
A. Bulwarks, decking.
Q. So rotted steel is going to be replaced anyway, right?
A. Well, it's got to be replaced once it's bent up. It might be chipped and cleaned up, and it was just there, rot.
Q. Did you better the tugboat by the repairs you did?
A. Oh, yeah.
Q. If you're replacing a rotted steel bulwark that

Page 53

had a ding in it or dent in it, you're bettering it. You're --
A. It was actually -- there is actually -- there's an area on the tug right now that was caused by the storm that never was repaired.
Q. So there still is more that has to be done on the Charlene?
A. Yeah, but I'm going to do it.
Q. So it could be more than 160?
A. You know, I just wanted -- I had had enough. Do you understand what I'm saying?
Q. Well, you had enough --
A. I spent six months in the shipyard with the Patrick.
Q. Yeah, but you're saying you still did the work, right?
A. What's that?
Q. You're saying you still did the work on the Charlene?
A. Yes.
Q. If you did the work, you would be entitled to reimbursement from the insurance company, right?
A. Yes.
Q. I mean, wherever you did the work and wherever you did it, if you did it and it was caused be the

Page 54

storm, you should be entitled to reimbursement, right?
A. Correct.
Q. So this had enough, I don't understand what you mean.
A. I had enough of shipyards, and I wanted to go back to work, wanted to start making money again and get my tugs back.
Q. What you're saying is after you went back to work, you continued to do work on the tug?
A. Absolutely. We never stopped working on it. There's men on it today working on it.
Q. So this should have been submitted to the insurance company?
A. Not if I make the decision to pay it myself.
Q. I'm a little at a loss.
A. I mean --
Q. You run a company in a manner that you don't want to pay for a line handler if you don't have to, but what you're suggesting is you're going to pay for the damage caused by a storm that's insured because you've made a decision to do that?
A. Right. I want to keep my insurance bills down. I'm a small company. I'm not a big, gigantic company.

Page 55

Q. The next line, Patrick Hunt sustained in excess of $800,000. Do you see that?
A. That's correct.
Q. Is that accurate?
A. Yes, sir.
Q. Did ACE Insurance Company pay you for any damages with respect to the Patrick Hunt?
A. Yes, it did.
Q. And what was paid to you by ACE Insurance Company?
A. Close to $600,000, maybe more; around six, six fifty, that figure, around there.
Q. So was there some amount of money, a hundred, 200 or $150,000, or somewhere in between $150,000 to $200,000 that was paid out by Hunt Marine that was not insured?
A. That's correct.
Q. Can you explain what happened in that regard?
A. We rebuilt the engines.
Q. Okay. And that had to do with the storm?
A. Rebuilding of the engines?
Q. Yeah.
A. No, sir.
Q. Okay. So you got me now. Explain this 150 to $200,000 that you're claiming as damages in this case against Senesco that didn't have to do with

the storm.
A. I explained it to you that -- you asked me -- $150,000 of it went toward rebuilding the engines. That was paid out of Hunt Marine's pocket.
Q. Yeah, but that didn't have to do with the storm.
A. No, sir.
Q. Correct?
A. That's correct.
Q. You can't claim it in this lawsuit, right?
A. No, sir.
Q. That's correct, right?
A. That's correct.
Q. So that number, 800 automatically goes down to something like 650?
A. That's correct.
Q. You understood, though, when this was submitted, this Counterclaim was submitted, that you couldn't claim against Senesco damage to the engines that weren't caused in the storm, right?
A. That's what I just told you.
Q. Why did you put it in there?
A. I would think that I didn't fill this out, but I think my secretary, who was -- I think she read it like how much damage was done to the tug, how much money was spent on the tug. And that's what I



believe she submitted to you folks.
Q. So she submitted as a Counterclaim against Senesco -- you had a secretary in your company look at how much money was put into the Patrick and put it in the Complaint, the Counterclaim that was filed in federal court where you were seeking damages from Senesco?
A. Can you repeat that?
Q. If I understand what you're saying here is that when the Counterclaim against Senesco was prepared, you went to your secretary, or someone went to your secretary, or the secretary of Hunt Marine, and what was provided was a number of all the repair work that went into the Patrick Hunt. And that was put in a claim against Senesco; is that what occurred?
A. No. I think what occurred is she looked up all the bills.
Q. Right.
A. She doesn't know whether them engines got damaged in the storm unless I tell her. And I didn't tell her that. In other words, she was probably asked how much was spent repairing the Patrick J. She looked at the billing, saw the billing came up to $800,000 and submitted the $800,000.



Q. Well, the concept here -- I mean, you understand that this is a document that --
A. I understand, sir.
Q. -- that actually is the basis for a lawsuit against Senesco, right?
A. Yes, sir.
Q. You understand that, right?
A. Yes.
Q. You understand that once Senesco was served with this, they hired -- they had people, lawyers, whomever else, looking into these figures, right?
A. Oh, yeah.
Q. Spending time trying to go through records, trying to figure out where these numbers came from, right?
A. Yes, sir.
Q. And you understand you had to have a good -- someone had to have a good-faith basis for alleging these numbers, right?
A. Yes, sir.
Q. Okay. But you didn't. You had no good-faith basis for suing Senesco to repair your engines on the Patrick, which couldn't have been caused by the storm, right?
A. That's correct.



Q. This wasn't a matter where you just said, "Let's just throw a number in there," right?
A. Oh, no. I don't do those things.
Q. It was something you took seriously, right?
A. Absolutely.
Q. If you go to the next page, page 9, paragraph 15, do you see that Hunt Marine was caused to sustain damages in the approximate amount of 1.2 million. Do you see that?
A. Yes, sir.
Q. And where does that number come from? I assume that wasn't from the secretary, was it?
A. Was that lost wages?
Q. You tell me. It's your document.
A. Yeah, that would be with the lost wages.
Q. Whose lost wages?
A. Hunt Marine's.
Q. Can you explain that category, lost wages? What do you mean by it?
A. When the two tugs got damaged, it had to be repaired. The tugs couldn't be working earning money, so we lost earnings.
Q. So it's lost earnings?
A. Yes.
Q. And how much are you claiming in lost earnings?

Page 60

A. Half a million.
Q. Half a million?
A. Yeah.
Q. $500,000?
A. That's correct.
Q. Is that a gross figure? Is that after you deduct whatever you saved by not operating the tugs?
A. I don't understand the question, sir.
Q. Well, you run this business, right?
A. Yes, sir.
Q. Do you actually captain tugboats anymore?
A. Once in a while.
Q. What's that mean? Once a year, couple times a year?
A. Whenever I need to be.
Q. What do you estimate it to be?
A. I don't know. I haven't been running them a lot lately.
Q. Have not been?
A. No.
Q. When is the last time you operated one, really operated one, went out and did a job?
A. Two weeks ago.
Q. How often have you done that in the last year?
A. I haven't.

Page 61

Q. Very rare nowadays when you actually operate?
A. That's correct.
Q. So you fully understand that lost earnings -- lost revenues is one thing, but lost profit is another, right?
A. (Witness nodding head affirmatively).
Q. Yes?
A. Yes, sir.
Q. You have tugboats that could have revenues of a hundred dollars. I'm making this up. You understand this, right?
A. Yes, sir.
Q. But before you put a dollar of that in your pocket you've got to take out for crews, and for fuel, and for all the other --
A. Right, after everything.
Q. All right.
So if tugboats aren't working for five months, you might have lost earnings, but -- which equal X, but your lost profit may equal somewhat less than X, right?
A. I'm going to go with lost profit.
Q. So you have $500,000 in lost profit, right?
A. Two tugs, yeah.
Q. So this 1.2 number, 1.2 million, is that -- does

Page 62

that include the repair costs plus this $500,000 lost profit?
A. That's correct.
Q. But the repair cost, if we go back to the prior page, if I got this right, the repair cost you had at a million, $200,000 for the Charlene, and $800,000 for the Patrick; so that's a million.
And if I read this Counterclaim correctly, when I first read it, that would lead to $200,000 on top of that for a total claim of 1.2 million. Is that what was being suggested in this document?
A. Can you repeat the question?
Q. When I first read this document -- actually, every time I've read it what I believed it to mean that you were stating was that the Charlene suffered $200,000 in damage, the Patrick $800,000, for a total of a million dollars in damages.
A. Right.
Q. And then on top of that, to get to the 1.2 million in damages, you had $200,000 in lost earnings or lost profit?
A. Well, if you take away the engine rebuilt and the less money on the Charlene, you have that figure.
Q. We have what figure?
A. 1.2.

Page 63

Q. But then you have to increase the lost profit?
A. No. You've got $600,000 that the insurance company paid out to the Patrick.
Q. Okay.
A. You've got less than a hundred thousand the insurance company paid out to the Charlene.
Q. Right.
A. That's seven.
Q. All right.
A. And five with the lost profit is 1.2.
Q. Okay. So no matter how we do it, it comes out to 1.2, right?
A. Yes, sir.
Q. But you understand you just can't make this up on the fly, right?
A. I understand that.
Q. So in the Complaint -- and I now understand you tell me these numbers are wrong in the Complaint -- but in the Complaint -- I call it a Complaint. It's really an Answer with a Counterclaim -- you said $200,000 for the Charlene, right? That's what you said, right? Correct?
A. Correct.
Q. You said $800,000 for the Patrick, right?

A. That's correct.
Q. And then my lawyer's math, which ain't so good, but it --
A. I'll bet it's pretty good.
Q. -- but it adds up to a million. And you would agree with that, right?
A. Yes, sir.
Q. And if you go to the total damages part, it says 1.2 million. And if the difference is the lost earnings or lost profit, that comes out to $200,000, right?
A. (Witness nodding head affirmatively).
Q. Yes?
A. Yes, sir.
Q. As you sit here today, you say that number is really $500,000 lost earnings?
MR. COLLINS: Lost profit.
Q. Loss profit really.
A. Lost profit.
Q. So today -- what's happened here today, if I have this right, is the repair costs have gone down, but the lost profit has doubled, more than doubled?
A. Where does it say 200 or 500,000 lost profit?
Q. Well, it's just simple math. If you go -- maybe



I'm wrong. If you go from the repair cost for the Charlene, 200; Patrick, 800, and then --
A. Right, I understand you go to the 1.2.
Q. Then you go -- then you go to the 1.2, and if you follow that through, you go, for example, to paragraph 21, 1.2 million; paragraph 23, 1.2 million; paragraph 28, 1.2 million. That's the total damage claim. So it's just simple math.
A. Okay. But I'm explaining to you the total damage claim on the vessels, because Hunt Marine paid for the engine repair, is less than what it says there. But if you add in the lost profit, you're at the $1.2 million.
Q. Okay. That's interesting.
But as of the day this was filed -- and this was filed November 4, 2007. Do you see that on the top of your document?
MR. COLLINS: November 14th.
Q. November 14, 2007?
A. November 14th.
Q. Do you see that?
A. Yes, sir.
Q. As of the day that this was filed, the lost profit was $200,000 you were claiming, right?
A. No, I don't see that there.



Q. Okay.
A. I see the math. I understand what you're talking about the math.
Q. Okay. So what part of it don't you get?
A. What I'm trying to tell you, and I explained to you, that the lost profit is there. That's there. We lost that money.
Q. Okay.
A. Repairs were less. I overestimated the repairs. And Hunt Marine paid $200,000 -- $150,000 or whatever it was.
Q. Unless you're just making this up, you can't have it both ways. You can't say that the repairs were a million, meaning the lost profit was 200, and now come in here and say, "Oh, I was wrong. Those numbers, 200 and 800 were much less than I claimed. But lo and behold, I had a bigger lost profit." I mean, is that what you do? You're just making it up here?
A. No. No.
Q. Where is the lost profit? Show me some document that shows your lost profit.
THE WITNESS: Do we have that here?
Q. Explain to me. If you don't have it here, explain to me what shows it. What document shows it?



A. Our taxes will show it.
Q. Your taxes show?
A. Lost money. You know, the books. Hunt Marine's books will show us. We made a great profit in 2006, and we lost money in 2007.
Q. Okay. When did you figure out that -- you would agree with me that one reading this document, the Answer with the Counterclaim, would be led to conclude that the lost profit or lost earnings -- I don't know which -- is $200,000; that's a reasonable reading of this, right?
A. No. Because I'm telling you that -- tell you what happened with the damages.
Q. We'll get to that. We're not even there yet.
I'm focusing on this document that was filed in federal court. And just focus on what I'm asking you. A reasonable reading of this, a guy coming in off the street --
A. Right.
Q. -- wants to figure out what's being claimed.
A. All right. Then he would say $200,000. That's correct.
Q. Now, if I'm getting this correctly, since this was filed, either this was a mistake in a lot of respects or something has changed. Which? Which

one? Is this a mistake, this pleading, or has something changed?
A. That's a mistake.
Q. So the Defendant's Answer with Counterclaim is a mistake on all the numbers, right?
A. That's correct.
Q. Except the ultimate $1.2 million damage number; that's constant?
A. That's correct. Right.
Q. So we can move around the categories: The repair for the Charlene, the repair for the Hunt - for the Patrick, and the lost profit. Those numbers all change, but we come out to a 1.2. That doesn't change, right?
A. Well, if everyone got their money back that put their money into this, it would come out to that, who lost money, who put money toward this situation.
Q. It would come out to the 1.2?
A. Yes.
Q. So, again, although the 200 is wrong and that changes, the 200 for the Charlene and the 500 for the Patrick is wrong, and that changes, and the lost --
A. Five hundred for Patrick?



Q. I mean 800 for the Patrick, that changes, and the –
A. The only reason that changes is because I didn't want ACE to pay for the engine repair. That's the only reason.
Q. Yeah. That would be insurance fraud, right? They couldn't pay for your engine repair.
A. Right. I wouldn't ask them to. That's stupid.
Q. But you would ask Senesco in this Complaint to?
A. Well, sir, right off the bat I told you what I did. First thing I said; we had an engine repair that Hunt Marine paid for. I said $600,000.
Q. The record will show it wasn't right off the bat. Okay?
A. Right off the bat, first thing I said to you.
Q. What I'm driving at here, though, Mr. Hunt, and you run a business; you're a savvy guy, and you understand $200,000 is wrong. We take some money off of that. $800,000 wrong; take some money off of that. And the $200,000 for lost earnings is wrong; it's gotta go up. But it all seems to come out to 1.2?
A. Right.
Q. Okay. Is that a coincidence?
A. No. You're asking me how we got to that number.



I'm telling you how we did.
Q. Who came up with these numbers in the Complaint -- in the Answer with the Counterclaim? Was that you?
A. No. I would have to say my secretary.
Q. Who is your secretary?
A. Cynthia Thompson. She handles the billing. She handles all the bills.
Q. Did you review this Answer with the Counterclaim before it went out?
A. Yes, I did.
Q. And did you review the numbers?
A. Not as well as I should have, obviously.
Q. Okay. Why don't we put this one aside for a minute and get back to this one later on.
I'm going to show you your Affidavit that you –
MR. ZONGHETTI: Can we have that marked, please.
(Plaintiff's Exhibit 2 for I.D.: Affidavit of Kevin Hunt dated May 2, 2008)
(Whereupon, a brief recess was taken at 1:01 p.m., and the proceedings resumed at 1:06 p.m.)



BY MR. ZONGHETTI:
Q. Now, you recognize Exhibit 2, right?
MR. COLLINS: It's got highlighting on his.
MR. ZONGHETTI: Maybe it doesn't make a difference. It really doesn't make a difference.
Q. You recognize Exhibit 2?
A. Yes. Yes, sir.
Q. It's an Affidavit that you prepared in conjunction with opposing a motion that Senesco had made to dismiss your Counterclaim as a result of failure to appear?
A. Mm-hmm.
Q. Yes?
A. Yes, sir.
Q. And in paragraph 2 of that -- not paragraph 2. If you could put it on the desk just so I could see it because I'm a little --
(Witness complies).
Thank you.
The first part of this talks about this procedure you had on your finger.
A. Yes, sir.
Q. That you were groggy and you called the attorney, and it got communicated too late to meet.

Page 72

Paragraph 8 it talks about -- it says, "On Sunday, April 13, I fell over the weekend." Do you see that?
A. Yes, sir.
Q. That's not -- what happened? Did you fall on Sunday?
A. I fell on Saturday.
Q. So you fell on Saturday, April 12th; is that correct?
A. Yes, sir.
Q. And where did you fall?
A. Aboard the tug Charlene.
Q. And what time did you fall?
A. 1730.
Q. What were you doing on the Charlene?
A. Going to put away a blower.
Q. And did you go to a doctor that day?
A. Next day.
Q. You went on Sunday?
A. Yes.
Q. Where did you go to the doctor?
A. South County Emergency Room.
Q. Are you sure you went the next day? Because the records that we were given say that you went on -- say that you went on April 15th, which would have

Page 73

been a Tuesday.
A. Then it was Tuesday. All I know I was hurting.
Q. So you fell on Saturday, right?
A. Yep.
Q. And what happened to you on Saturday? You fell where? On the Charlene where?
A. Jumping down from the barge to the tug on the bulwarks. It was -- I don't think it was oil. It was just the pavement looked a little shiny there. And my left foot -- I usually land on my right foot when I jump aboard tugs. And I landed on my left and it flew out. And I flew. And I ended up all smashed in a ball into the deck, between the house and the bulwarks, thinking my left leg was snapped in half.
Q. Okay. So when you fell, you thought your left leg was snapped?
A. Yeah.
Q. But you got up and got off the boat?
A. Yes, sir.
Q. And you realized your left leg wasn't snapped?
A. Yes, sir.
Q. And you realized it that day, right?
A. Well, I didn't see a bone sticking out of my leg.
Q. You didn't go to the doctor, or you didn't go to

Page 74

the hospital. So you knew you didn't have a broken leg, right?
A. Oh, no, that's not true.
Q. You thought you had a broken leg?
A. I was hoping I didn't.
Q. Well, I'm not asking hoping. Everyone hopes they don't --
A. Well, that's why you don't go to the emergency room right away. You want to see if you can ride the storm out.
Q. Did you think you had a broken leg?
A. When it wasn't getting any better, yes, I did.
Q. That day, that Saturday, and this happened about 5:30 at night --
A. Did I think I had a broken leg? Yes.
Q. -- why wouldn't you have gone to the hospital if you thought you had a broken leg?
A. Again, I was hoping I was wrong. I was hoping that maybe if I went home and rested and had a full night's sleep on it and, you know, it wasn't broken. And by the time I got home, I was walking on it; realized that, well, it ain't broken because I wouldn't be walking the way I am. But I was in tremendous pain.
Q. So by the time you got home that night, Saturday

Page 75

night, which was what time?
A. It was about 7:00 o'clock.
Q. So by 7:00 o'clock on Saturday night you knew you didn't have a broken leg, right?
A. I wasn't a hundred percent sure I didn't have a broken leg.
Q. You were pretty darn sure you didn't have a broken leg; otherwise, you would have gone to the hospital, right?
A. No, not right then. I was too dirty, too tired, too much pain. No, I wouldn't have went unless an ambulance came and got me.
Q. Too much pain to go to the hospital; that's the concept?
A. Oh, man. Yeah.
Q. Okay. And the thing I really don't get here, and I think the judge didn't get either, "Because of my concern over the condition of my leg, I completely forgot about the deposition." What does that mean?
A. I forgot about the deposition.
Q. That had something to do with your leg?
A. It had to do with my whole physical body, being. I was in great trauma.
Q. Well, you went to the hospital --

Page 76

A. It wasn't a boo-boo. It was a big smash.
Q. You went to the hospital a couple of days later, and there was nothing wrong with you. It was a boo-boo, as they say.
A. As a matter of fact, I'm still -- on August 7th, or July 7th I have an appointment with a -- what do you call them -- an orthopedics man because I don't feel the leg is healed yet.
Q. Okay. So this was such a big trauma that it affected your memory?
A. I got really hurt.
Q. Just focus on my question. The trauma affected your memory?
A. Yes.
Q. Okay. You were -- you were well aware that you did have the deposition for Monday, the 14th, right?
A. No, I wasn't.
Q. Okay. What does that mean? You weren't told about it?
A. I thought the deposition was Tuesday morning. Because when I was told of this, I had just had hand surgery, and I was on pain medication. I was whacked right out of it on pain medication. And I thought my attorney told me Tuesday morning.

Page 77

You want me to lie? I'll lie. I'm telling you the truth.
Q. No, actually, it's not what I want. And you may be confused about this. When you --
A. I'm telling the truth.
Q. Wait a second. This is important. When you put your right hand up and swore to tell the truth, you were taking an oath, which if you lie, you could be prosecuted for perjury. So it's not what I want. It's what the laws requires.
A. Okay.
Q. You understand that, don't you? You understand that?
A. I'd appreciate you not pointing at me.
Q. I don't mean to point at you. I want you to be clear here.
A. Okay.
Q. When you use the phrase, "I'm telling the truth. I could lie," I want you to be very certain that if you lie --
A. When it comes to --
Q. -- there could be penalties under the law.
A. When it comes to my health, I'm not going to make stuff up.
Q. When it comes to your health, you're not going to

Page 78

make stuff up? Is that what you just said?
A. That's what I just said.
Q. So the real problem here was you thought, because you were groggy, that the deposition was on Tuesday morning?
A. That's correct. But then we had all the trauma over the weekend.
Q. So let's just go back a step. You had surgery on Thursday?
A. Wednesday.
Q. Wednesday; is that correct?
A. Wednesday afternoon.
Q. Wednesday afternoon. And the original plan -- that was Wednesday the 9th; is that correct?
A. Original plan was for Thursday morning here.
Q. Let's go back a step. April 9th, 2008, was a Wednesday; is that correct?
A. That's correct.
Q. You had known you were going in for a procedure on your finger prior to that date; is that correct?
A. Yes, sir.
Q. Despite that, and perhaps because you believed you would be well enough and clear minded enough to be deposed on Thursday, April 10th, you agreed to the deposition on that day; is that correct?

Page 79

A. That's correct.
Q. What happened was at some point after that one-day surgery -- it was an in-and-out procedure?
A. Yeah.
Q. And was it under general anesthesia or local anesthesia? General meaning you're knocked out.
A. I know what it is. No, I was -- no, I was awake.
Q. Sometime after that, you were put on pain medication; is that correct?
A. Yeah, morphine first and then pain medication.
Q. And you realized that this may affect your ability to appear the next day for the deposition that had been scheduled, right?
A. That's correct.
Q. And you put a call into your attorney?
A. That's correct.
Q. And you sought to put off that deposition?
A. That's correct.
Q. At some point in time you received a call back from an attorney rescheduling the deposition; is that also correct?
A. That's correct.
Q. And was that from a Mr. Collins or from a Mr. Clinton?
A. Mr. Clinton.

Q. Okay. And when was that call?
A. I believe it was Thursday afternoon, Thursday noontime.
Q. So that would be Thursday, April 10th, sometime in the afternoon?
A. I believe so.
Q. And your belief at that point in time was that the deposition had been scheduled for Tuesday, which would be April 15th?
A. That's correct.
Q. And you believed it was for the morning of Tuesday, April 15th?
A. That's correct.
Q. After that conversation scheduling the deposition, which you believed to be for Tuesday, April 15th, did you have any other conversation with attorneys, what have you, where you were given a different date?
A. No, sir.
Q. So from Thursday, April --
A. 10th.
Q. -- 10th, until sometime on Monday, April 14th, you believed the deposition was going to take place on Tuesday, the 15th; is that correct?
A. That's correct.



Q. And that is the reason you didn't appear on Monday, the 14th, right?
A. That's correct.
Q. On Monday, the 14th, at some point in time you received a phone call from Mr. Clinton, and you realized that you had the date wrong?
A. That's correct.
Q. And when you got that phone call, where were you?
A. On my couch.
Q. At your home?
A. Yes.
Q. And you called this office and to see if you could come, right?
A. (Witness nodding head affirmatively).
Q. Is that correct?
A. That's correct.
Q. But it was too late; everyone had already gone, right?
A. Yes.
Q. What then happened was you realized -- you were informed that Senesco, through me, was making a motion to dismiss the case?
A. I don't know. I hadn't spoke to anybody.
Q. At some point after the deposition date came and went, you believed it was the 15th --



A. Can we turn the air on in here?
Q. I can find out about it.
(Whereupon, a brief discussion was had off the record, and the following proceedings continued.)
BY MR. ZONGHETTI:
Q. Sometime after this deposition that had actually been scheduled for the 14th, but what you believed was scheduled for the 15th, when that date came and went, those two dates came and went, you realized that a motion was being filed concerning your nonappearance, right?
A. No, sir.
Q. What gave rise to this Affidavit, Exhibit 2?
A. I found out later in that week that there was a motion filed.
Q. That's all. And you realized that you had to submit something to explain why you didn't appear, right?
A. (Witness nodding head affirmatively).
Q. Yes?
A. Yes, sir.
Q. Nowhere in Exhibit 2 do you state the real problem, which was you believed it was scheduled for April 15th, right?



A. Well, you have to understand something. Between having my hand and being in all that pain, and all of a sudden falling, it wasn't a good three or four days for me.
Q. Okay. Understood.
A. Okay? It was a very -- I didn't know which way was up or down. All right? I'm in a lot of trauma, a lot of pain, a lot of -- really, you know, just -- it was a bad time. I had no reason or no business to miss this. As a matter of fact, I was looking forward to it.
Q. I have that effect on people. They look forward to meeting with me.
Getting back to my question, though.
A. They're lying to you, but that's beside the point.
Q. I'm not under oath.
Getting back to my question, though, nowhere in this Exhibit 2, the Affidavit that you prepared and signed, May 2nd, 2008, do you mention the real reason that you didn't show up, that you testified to, which was that you had the date wrong?
A. Can I see that, please?
Q. Yeah, sure.
(Witness perusing the document).

Page 84

Q. Is that correct?
A. What?
Q. The question I asked. In this Affidavit that you prepared you didn't mention the real reason you missed the deposition, which was you had the date wrong. You believed it was the 15th instead of the 14th; is that correct?
A. That's correct.
MR. ZONGHETTI: Can I have that marked, please.
(Plaintiff's Exhibit 3 for I.D.: Senesco Invoice dated 4/4/2007 to Hunt Marine Towing & Transportation)
Q. I'm going to show you what's been marked as Plaintiff's Exhibit 3, which is an invoice from Hunt -- from Senesco to Hunt Marine Towing & Transportation. It's dated April 4th, 2007. Do you see that document, sir?
A. Yes, sir.
Q. And do you recognize that document?
A. Yes, sir.
Q. And do you recognize that document to be an invoice that was sent to you on behalf of Hunt Marine by Senesco for various services and wharfage for a period starting March 19th, 2007?

Page 85

A. I don't see March 19th.
Q. If you look under - the first item under Description.
A. I got it.
Q. Storage -- actually, that's incorrect. It's as early as March 8th, if you go to the second item, wharfage.
A. That was something I never agreed to.
Q. You've seen this before; is that correct?
A. Not like this.
Q. You've never seen this invoice?
A. Not this detailed.
Q. Do you -- is it your position that your company didn't receive this or you just never saw this?
A. I never seen it written like this.
Q. Do you have reason to believe your company never received it?
A. No. I would have saw it. If it got mailed to Box 3354, I would have saw it.
Q. You do understand -- you do understand that Senesco Marine issued an invoice to Hunt Marine for balance of $6,244 for the various services included in this exhibit?
A. Yep.
Q. And do you also understand that Hunt Marine --

Page 86

A. And I disputed this with Steve.
Q. Okay. Well, let's focus on my question here. Hunt Marine did not pay this invoice; is that correct?
A. We paid part of it.
Q. Okay. What part of this did you pay?
A. I would have to call my office.
Q. What part of it did you dispute?
A. The storage container box.
Q. Okay. So that would be a thousand dollars?
A. Mm-hmm.
Q. Yes?
A. Yes. Yes, sir.
Q. And what else did you dispute?
A. Wharfage for the two tugs.
Q. And why would you dispute the wharfage for the two tugs?
A. Because when I made the deal, it was for lineal feet, not the width of the vessel.
Q. Okay. So what you're saying is that when you made the deal, your understanding of the deal was that you would pay for the linear footage of a tug directly against the dock. But if you breasted a tug to that tug, you didn't have to pay for the breasted tug?

Page 87

A. That's right.
Q. And in this instance there are charges for wharfage on the Charlene and wharfage on the Patrick; is that correct?
A. That's correct.
Q. And if I understand it correctly, what you're saying is that at all times you had your tugs breasted, so you shouldn't have been charged for one of those tugs?
A. That's correct.
Q. In this circumstance on this invoice which tug were you saying you shouldn't have been charged for?
A. Patrick.
Q. So what you had done was you had tied the Charlene up to the dock; is that correct?
A. That's correct.
Q. And the Charlene is a larger or smaller vessel than the Patrick?
A. Larger.
Q. And you had no problem paying for the wharfage on the Charlene then, right?
A. No.
Q. Is that correct?
A. That's correct, sir.

Page 88

Q. So that $3,000 you would have no problem with, $3,000 charge for the Charlene?
A. That's correct.
Q. And you tied the Patrick to the Charlene; is that correct?
A. That's correct.
Q. Now, you did have a problem paying for Patrick, right?
A. Questioned it.
Q. Questioned it. You didn't pay it, right?
A. I don't know. I don't know. I have to find out. I know we made a payment toward the Senesco bills.
Q. Now, the storage container, the storage on the container box, what was the problem with that?
A. Mike and Craig never said anything about a storage box.
Q. Did you have a storage box on the dock?
A. Yeah, a 20-footer.
Q. So this was actually a 20-foot container?
A. Yes, sir.
Q. And it was your belief that that would be stored on the pier for free?
A. Yes.
Q. Why would you get free storage of the container?
A. I don't know. As a matter of fact, as soon as I

Page 89

found out they were going to do that, I got it out of there.
Q. So your position was that they didn't mention it, that they were going to charge me for it, and that would mean to me I don't have to pay for it, right?
A. What?
Q. What your position was when you saw this invoice was they didn't mention to me that I would have to pay for the container being stored on the dock. Since they didn't mention it to me, I don't believe I should have to pay for it?
A. That's correct.
Q. So essentially if it wasn't mentioned at the meeting, you took the position I don't have to pay for it, right?
A. Wasn't part of the deal.
Q. So anything that wasn't part of the deal, discussed and agreed on at that meeting, as far as you were concerned, wasn't part of the deal, right?
A. That is correct.
Q. And you wouldn't have to pay for it, correct?
A. Correct.
Q. Now, why did you have the Charlene tied to the

Page 90

dock at this point in time and not the Patrick?
A. Just the way the boats laid. Charlene came in first.
Q. When your boats came in and were tied up at the Senesco dock, who determined which way they were facing, whether they were out bow to the bay or --
A. We did.
Q. That was something that was up to your captains; is that correct?
A. Correct.
Q. And which was to the dock and which was breasted was also something you determined, your captains would determine; is that correct?
A. That's correct.
Q. And is that something that you got involved in or was that something the captains would decide?
A. Both.
Q. Sometimes you were asked how they should be tied up?
A. Or sometimes I would tell them how to tie it up. If we were going to do a certain thing or get something off, or, you know, whatever.
Q. Would you be down at the dock or would you do this over the radio or over the telephone?
A. No. Usually I would be at the dock.

Page 91

Q. Was there a preferred way to tie up the boats at the Senesco Carrier Pier, whether it was bow out into the bay or --
A. What's that?
Q. Was there a preferred way that you tied up?
MR. COLLINS: In terms of direction of the bow?
MR. ZONGHETTI: Correct.
A. I understand the question. No. Either way.
Q. Whose lines were used to tie your boats up?
A. My lines. Hunt Marine's ropes.
Q. Hunt Marine's lines, correct?
A. That's correct.
Q. And those were lines that were on the tugs?
A. Yes, sir.
Q. In the storage container what, if anything, did Hunt Marine keep?
A. Spare parts, some rope.
Q. Parts for the tugs?
A. Yeah, tugboat miscellaneous.
Q. Where did you move the storage container to after you got this invoice?
A. Out of that area.
Q. Where to?
A. Is that your business or mine?

Page 92

Q. It's my business right now because I'm asking about it.
A. Well, I mean, excuse my -- you know, what has that got to do with the price of tea in China?
Q. You don't want to answer that one?
A. I'll gladly answer it. I just don't understand why.
Q. Did you move it to some place that you had to pay for storage?
A. No. I moved it to my brother-in-law's factory, the meat packing plant.
Q. All right. That's not so hard, right?
A. Well, I don't know about not so hard, but it's kind of -- I don't know.
Q. Now, there were charges for crane support. Do you see that?
A. Yep.
Q. And that was -- what had happened was Senesco provided crane support for you to do some work on the Hunt Girls?
A. I don't remember that. Oh, yeah, excuse me. They did some unsatisfactory work to the bow, yes.
Q. Was that something you didn't pay for?
A. I paid, still paid.
Q. Well, the unsatisfactory work to the bow, what did

Page 93

they do?
A. They -- nothing, if you want to know the truth. Nothing. I wasn't happy with the work. Put it that way.
Q. But whatever they did, whatever --
A. It was going to be paid.
Q. -- crane services they provided, whatever men they provided for the repair --
A. Yes.
Q. -- that was something that Hunt Marine had to pay for, right?
A. Yes.
Q. Was that something that was discussed in this meeting of January of 2007, or was that just understood?
A. Just understood.
Q. You weren't getting anything for free from Senesco, period?
A. No.
Q. Right?
A. Nope.
Q. Correct?
A. That's correct.
Q. Did you ever think that Ziegler, Ziggy, William Ziegler had the authority to bind Senesco to any

Page 94

sort of agreements?
A. No, sir.
Q. You recognized that he did not; fair to say?
A. Of course.
Q. Just like a deckhand on your tugboat wouldn't have authority to bind you, Hunt Marine, to some agreement with some dock, right?
A. That's correct, sir.
Q. How long did you know William Ziegler before this April 2007 Nor'easter?
A. I guess about four years.
Q. And what was the nature of the relationship?
A. Ziggy worked for Senesco, and I tied my stuff up there.
Q. And you would see him occasionally when you were at Senesco's Carrier Pier?
A. That's correct.
Q. Did you ever go out to dinner, go out for drinks?
A. Yeah. I took him and two other guys out. They did something -- they did something. I took them out to dinner.
Q. Anything other than that? Ball games, bars, anything like that?
A. No, never.
Q. Did you ever pay him directly for anything?

Page 95

A. Nope, never.
Q. Did he ever work for your company?
A. Later on after his - he ceased at Senesco, yeah.
Q. Can you explain how that came about?
A. He called me up told me he wasn't working for Senesco anymore. Do you have any work?
Q. Do you remember when that happened?
A. Maybe March. Maybe March.
Q. Of 2008?
A. Yeah.
Q. So he called you up. And he had your cell phone number? You would communicate with him occasionally by phone?
A. Yeah. Yes, sir.
Q. Okay. What kinds of things would you communicate with him by phone about?
MR. COLLINS: When?
MR. ZONGHETTI: At any point.
A. No. The only time -- I hadn't heard from him since he left till the time he called me in March looking for work.
Q. Okay. He called you up saying he needed work. Did you have work for him?
A. Yeah.
Q. And what kind of work did he do for you in March?

Page 96

A. Welding.
Q. Welding. That's his trade, right? He's a welder by trade?
A. Yes, sir.
Q. And what kind of welding did he do?
A. Tank work on the Hunt Girls.
Q. And was the Hunt Girls -- were they at this Conley Pier at the time?
A. Yes.
Q. And it was obviously in the water, the tug?
A. Yes, sir.
Q. So he was doing tank work on the tugboat while it was docked at Conley's?
A. Yes, sir.
Q. And for how long did he work for you?
A. Probably -- approximately two or three weeks.
Q. And what happened at that point?
A. Hunt Girls went to work. And then I believe he got a job somewhere else.
Q. Have you spoken with him in the last month?
A. No, sir.
Q. Are you aware that he was deposed, his deposition was given in this case?
A. Yes.
Q. Have you -- did you speak to him before the

Page 97

deposition?
A. No, sir.
Q. Did you speak to him after the deposition?
A. No, sir.
Q. Who was the other guy that you mentioned from the dock? That was a Greg Daum; is that correct?
A. Yes, sir.
Q. And did he ever work for you?
A. No, sir.
Q. Who was the other guy?
A. Silvio.
Q. Did he ever work for you?
A. No, sir.
Q. Silvio D'Amico?
A. I don't know his last name.
Q. Did he ever do any kind of work for your company?
A. No, sir, except when he was the deckhand working for Senesco.
Q. Was Ziggy paid cash when he worked for you?
A. Yes. He's going to get a 1099.
Q. Much to his surprise, right?
A. That's his problem.
Q. Okay. I want to show you something -- this is --
MR. ZONGHETTI: Why don't we have this marked.

Page 98

(Plaintiff's Exhibit 4 for I.D.: Document entitled, "2007 Standard Diary, Daily Reminder)
Q. I show you Plaintiff's 4. It was sent to us and represented that it's the Patrick's logbook for 2007, or a copy of it rather.
I would ask you to take a look at it.
(Witness complies).
Q. Does that appear to be a copy of the logbook for the Patrick?
A. Yes, looks like it.
Q. Now, the original, would this be one of these red bound books --
A. Yes.
Q. -- that you keep on board the tugs typically?
A. Yes, sir.
Q. And it's filled out by the captain or the mate on duty?
A. On watch.
Q. And the logbook is something the Coast Guard requires to be kept?
A. Absolutely.
Q. If we go to the month of March 2007 --
A. Okay.
Q. -- there's a point in time during the month of March 2007 where the logbook starts to

Page 99

consistently read standby. If you can perhaps go to that page where it starts.
(Witness complies).
A. Okay.
Q. So starting on March 22nd -- do you see that --
A. Yep.
Q. -- 2007, the logbook starts to read -- there's an abbreviation for what appears to be standby; is that correct?
A. Yep.
Q. And that carries forward through the month of March into the month of April?
A. That's correct.
Q. And then in April we get to the out of service starting on -- is it April 16th?
A. Yes, sir.
Q. And that April 16th out of service, or the abbreviation for out of service, coincides with the Nor'easter?
A. Yes, sir.
Q. Now, you can put that down for a second.
The standby entries from March 22nd to April 16th, what were the reasons for those entries? What was going on with the Patrick?
A. They were -- it was lack of work.

Page 100

Q. There was no work for the tug at that point in time; is that correct?
A. (Witness nodding head affirmatively). We were doing some work on the boat.
Q. I'm sorry, you were shaking your head. You have to answer. I understood what you were saying, but she doesn't. She can't get it.
A. Oh, I'm sorry.
Q. There was a lack of work for the Patrick at that point in time?
A. Yes, sir.
Q. What type of work does the Patrick typically do? Did it have one customer that it did a lot of work for?
A. Mostly Weeks Marine.
Q. And is that out of New York?
A. Yes, sir.
Q. And how did that work? Was there a contract or was it a charter?
A. Contract. Daily rate with them paying the fuel and lube.
Q. Daily rate without fuel and lube?
A. With them paying the fuel and lube.
Q. And before March 22nd of 2007 was the Patrick on a contract for Weeks?

Page 101

A. I believe it was, yes.
Q. And did that contract end around March 22nd?
A. Yes, I believe so.
Q. And at the time that contract ended was - what were the prospects for the Patrick? Did she have work lined up? Were you looking for work for the Patrick?
A. Yeah, I was looking for work for the Patrick.
Q. Was there any?
A. Any time any of the boats get laid off, we look for work.
Q. What was the Charlene doing at that time, March of 2007?
A. She was tied up, lack of work.
Q. Now, it's been represented to us that the Charlene's logbooks don't exist anymore for 2007.
A. They were stolen. Everything was stolen off the boat.
Q. What kinds of things were stolen off the Charlene?
A. The binoculars, some guy's personal stuff, cigarettes, stuff like that. Somebody came aboard.
Q. Was radar stolen?
A. No.
Q. So binoculars, cigarettes?

Page 102

A. Yeah. A hand-held GPS.
Q. Logbooks?
A. Logbooks.
Q. Anything else?
A. No.
Q. And when was this stolen?
A. I'm not really sure. I think around June.
Q. Of 2007?
A. I believe so.
Q. Where was the Charlene at that point in time?
A. Hinckley's.
Q. It was in the shipyard?
A. Hinckley's.
Q. What is Hinckley's?
A. It's a yacht yard, a boat yard over in Portsmouth.
Q. Was it working? Was it out of work?
A. It was damaged after the storm.
Q. Was the Charlene unable to work immediately after the storm, or was it in working condition?
A. It was in working condition.
Q. It was in working condition?
A. Yes, sir.
Q. So what was it doing at Hinckley's?
A. Just --
Q. It was tied up there?

Page 103

A. Just waiting to see what we were going to do with it, what shipyard we were going to go to. We couldn't find a shipyard to lift her. She's a big boat.
Q. So there is no logbook for the Charlene?
A. Not to my knowledge, sir. We looked everywhere and we feel that it was stolen when everything else was stolen off the boat.
Q. Because in March of 2007 the Charlene, like the Patrick, was out of service waiting for work?
A. Yes, sir.
Q. And what type of work was the Charlene doing?
A. She was working steady for Weeks too.
Q. What happened with Weeks, did they run out of work?
A. The job got completed.
Q. The job ended?
A. Yeah. You know, doing a dredging job somewhere or building a pier. The pier was either completed or the dredging job was dug, and that was finished.
And usually -- occasionally there's some in-between time, but sometimes we keep going right from job to job.
Q. Now in March, March 22nd, '07, because the Patrick was out of work at that time and because the

Page 104

Charlene was out of work at the time, were both vessels at -- were both boats at Senesco's pier?
A. That's correct.
Q. And --
MR. COLLINS: This is March of '07 now?
THE WITNESS: Yeah.
MR. ZONGHETTI: Yeah.
Q. And while they were at Senesco's dock, was any work being done on those boats?
A. Yes.
Q. What work was being done?
A. We were having engine work done to the Patrick.
Q. What type of engine work was being done to the Patrick?
A. We were -- port engine we had problems with. Starboard was running. I forgot exactly what the problems were, but I know the port engine was down.
Q. And how about the Charlene, was anything being done on that?
A. Charlene was running, but she needed engine work. Boats always need work.
Q. But this would be an opportunity -- if there's no work for both tugs, that's a good opportunity to get work done on them, right?

Page 105

A. Right. That's what we were doing.
Q. And that would be the goal?
A. Yes, that's what we were doing.
Q. And the concept was that the boats were tied up at Senesco's dock, and you would do whatever work you could do on the boats and, if necessary, you would get assistance from Senesco, for which you would pay?
A. Yeah. Yes, sir.
Q. And since both boats were at the dock getting work, this was a situation where they were breasted one to the other?
A. Yes, sir.
Q. Would you move the boats around if you needed to get something on one boat?
A. Yes.
Q. So you might move the Charlene into the dock and move the Patrick out, --
A. Yes.
Q. -- right?
That's how you did it?
A. The reason the Patrick was alongside the dock is we cleaned the hole out, forward cargo hole that Friday.
Q. Before the storm?

Page 106

A. Before the storm.
Q. Was Patrick typically not against the dock and Charlene was while you were there?
A. It varied.
Q. Was there any reason for one being to the dock or not, or just circumstance?
A. As I said, Patrick was alongside so we could clean the hole out. It was a big job to clean the hole out.
Q. Well, you made sure you kept only one boat to the dock so you wouldn't pay for the linear footage of the other?
A. Which I thought, yes.
Q. That was the reason?
A. Oh, yeah. No, no. I wouldn't -- no reason to eat up all their dock.
Q. And no reason to pay for all the dock, right?
A. Well, I was under the understanding that was the deal, yes.
Q. I'm not faulting you. I just want to get it clear. You made sure you had only one boat to the dock because you didn't want to pay for the linear footage of two boats, right?
A. Yeah.
Q. Yes?

Page 107

A. No. No, sir. If we had been back in the old days of bartering with the jobbers, I would have them tied up together. That's the way we do it. That's the way tugboats do it.
THE WITNESS: I need to go to the men's room.
MR. ZONGHETTI: Sure. We'll take a break.
(Whereupon, a brief recess was taken at 1:54 p.m., and the proceedings resumed at 2:01 p.m.)
MR. ZONGHETTI: Can I have that marked, please.
(Plaintiff's Exhibit 5 for I.D.: Four pages of logbook for Patrick J. Hunt, dated May 21, 22 and 23, 2007)
Q. I would like to show you what I've marked as Exhibit 5, sir. This was -- it's entitled, "Hunt Marine Towing & Transportation, Tug Patrick Hunt." And there's a date on it, May 21st. Do you see that?
A. Okay.
Q. Now, this was produced to us initially -- May 21st, 2007; May 22nd, 2007; May 23rd, 2007, and ending there.
This was produced to us initially as a

file, an Excel file, computer file, that was represented as the logbook for the Patrick Hunt.
A. Okay.
Q. That would show -- that shows that -- excuse me -- on the logbook in this form, for example, that the Patrick Hunt was working on May 21st, abeam Plum Island. Hells Gate. There's entries, secure tow to Millers launch.
A. May 21st when?
Q. May 21st and May 22nd, 2007?
A. No, no. You have the -- I don't know where you got that.
Q. You tell me.
A. No, you tell me.
Q. No, no. You tell me. This was given to us by your company through your lawyers.
A. Patrick J. was in the -- she was in -- 2006 you mean?
Q. No. It says 2007. Go to the next page.
A. Oh. So what are you questioning?
Q. Well, if you go to the other exhibit, Exhibit 4, in May of 2007 it was out of service supposedly due to the storm, the Patrick, right?
A. Yeah.
Q. Okay. The exhibit in front of you, Exhibit 5 is a



logbook from 2007 which shows it working.
A. Never. Something is the matter here, man. No way. Nope. In other words, what you're saying is the Patrick was working after the storm?
Q. I'm not saying anything. These are documents your company produced through your lawyers to us.
A. That's 07. '06 is when she was damaged.
Q. No. The Nor'easter was April 16, 2007.
A. Okay. Okay. Right after that she got towed to Fairhaven Shipyard. And from the time she got towed to Fairhaven Shipyard until the end of September she was in Fairhaven Shipyard.
Q. The document in front of you --
A. We didn't do no jobs.
Q. The document in front of you –
A. IMTT? Liberty. This was the Hunt Girls. This is the tug Hunt Girls.
Q. It says Tug Patrick Hunt.
A. It should be the tug Hunt Girls. This should be the tug Hunt Girls.
Q. Let me see that again?
Who was the captain of the Patrick?
MR. COLLINS: In?
A. When?
Q. 2007.



A. Then was Ben Peterson. But he filled in -- when the Patrick went down, he went on the Hunt Girls.
Q. Who was the mate on the Patrick?
A. I don't know. I don't know.
Q. Who is the engineer?
A. On the date of the storm, Steve Barry.
Q. I don't know what that document is, sir, Exhibit 5. That was given to us in that form by your company.
A. Yeah, this is the Hunt Girls. I could get you this. I can get you the log matching the Hunt Girls.
Q. So that's a mistake?
A. Yeah, this is a total mistake. No question about it.
MR. ZONGHETTI: Why don't we have this marked.
A. That shouldn't be no debate. The tug never went to work. I'll tell you right now it never went to work.
(Plaintiff's Exhibit 6 for I.D.: Payroll document for Tug Patrick J. Hunt for week ending 27 May '07)
Q. I show you Exhibit 6, which was also given to us by your company. Do you recognize that document?



A. That's a payroll.
Q. And who are the individuals on that payroll?
A. Guys working aboard the tugboat in the shipyard.
Q. And that's for the Patrick Hunt?
A. Yes.
Q. So those were guys that you hired to work on the Patrick Hunt to do some sort of repairs?
A. Yeah.
Q. And were they hourly employees?
A. Yes, sir.
Q. I'll get back to that.
MR. ZONGHETTI: Let me have this marked.
(Plaintiff's Exhibit 7 for I.D.: Seven pages of logbook for Patrick J. Hunt, dated May 29, 30, 31, June 1, 2 and 3, 2007)
Q. I'm going to show you Exhibit 7, which was also produced to us as being a logbook for the Patrick, printout of the logbook for the Patrick. That was for starting the end of May into June of 2007. Do you see that?
A. Yeah, this is all the Hunt Girls.
Q. So logbook for the Patrick, or what was produced to us as a logbook for the Patrick was really for the Hunt Girls it appears?
A. Yes, sir.

Page 112

Q. How does that work? You keep the written log on the boat, and is there some --
A. And they e-mail my office the logs every day -- or every week I should say.
Yeah, this is when we worked with Don John (phonetic). I remember this. This is all the Hunt Girls.
Q. Hunt Girls is another one of your tugs?
A. Yes, sir.
Q. The captain -- after the Patrick -- after the Nor'easter, did the captain from the Patrick go to work on the Hunt Girls?
A. Yes, sir.
Q. And why did that happen?
A. He's senior man.
Q. And what happened to the less senior man who had been working on the Hunt Girls, if there was one? Was he laid off?
A. Either laid off or came to work on the Patrick in the shipyard. I try to keep everybody going.
Q. Who was the Hunt Girls' captain?
A. Dan Smith was the master of the boat.
MR. COLLINS: Before the storm you mean?
MR. ZONGHETTI: At the time of the storm.
A. Dan Smith.

Page 113

Q. Dan Smith. And did he go to work on the Patrick in the shipyard?
A. No. He stayed on the Hunt Girls. He just went on as time off when Ben worked. He relieved Ben. Ben relieved him I should say.
Q. So Ben Peterson went over to the Hunt Girls?
A. Yes.
Q. And Dan Smith stayed on the Hunt Girls?
A. Either stayed on or had some time off, either/or. I could show you the Hunt Girls -- or the Patrick J. never worked from the time it got beat up in the storm till the time it got out of the shipyard.
Q. Now, in terms of the Patrick was on standby from March 22nd going forward for some period of time, at the time of the Nor'easter it was still on standby, right?
A. Yeah.
Q. How long -- do you have any idea how long it was going to be in that status?
A. No. It could be the next day.
Q. Well, it could be any day.
A. Right.
Q. It could be a day; it could be a week, two weeks.
A. Right.

Page 114

Q. You have no idea?
A. No idea.
Q. Same with the Charlene?
A. Same with the Charlene.
Q. Was the engine work done on the Patrick as of the time of the Nor'easter?
A. Was the engine work --
Q. There was some engine work that was being done --
A. We were doing some engine work. Not the big job that we did once we went in the shipyard. We figured we were in the shipyard now; we're going to be down for a long time; here's a time to rebuild these engines.
Q. Was that, the rebuilding of the engines, was that something that had been planned to do?
A. We were talking about it, yes.
Q. How long did that take?
A. Rebuilding of the engines? About two months, I believe.
Q. Two straight months?
A. I believe so. I'm not -- I didn't participate. I don't know.
Q. And you took advantage of it being down for other repairs. Made sense, right?
A. (Witness nodding head affirmatively).

Page 115

Q. Yes?
A. Yes.
Q. So while the other repairs were going on, you took advantage of the time to rebuild the engines?
A. Yes.
Q. And that took about two months?
A. I believe so, sir.
Q. Who did the rebuilding of the engines?
A. Casco Bay and Fairhaven Shipyard.
Q. And do you know what period of time, while the Patrick was out of service after the Nor'easter, that that rebuilding of the engines took place, what months it took place in?
A. I believe it was end of June, July.
Q. Was it out of the water at this point in time?
A. Yes, sir.
Q. And I assume other work was being done at the same time?
A. Oh, yes, sir.
Q. And that would include steel work?
A. Yes, sir.
Q. The engine -- did you have the engines pulled?
A. (Witness shaking head negatively).
Q. No?
A. No, sir.

Page 116

Q. Was that -- did that work have to be done out of the water?
A. No, sir.
Q. Could have been done in the water?
A. Yes, sir.
Q. Was it easier to do out of the water?
A. I don't think it really has an effect on it.
Q. Didn't matter.
Was there any period of time that you were waiting for ACE to approve getting payment to Fairhaven before you got into Fairhaven?
A. Repeat the question, please?
Q. ACE Insurance, after the Nor'easter, that was your insurance company; they had the surveyor come out take a look at what needed to be done. And you found the shipyard that you were going to go into to do the work, right?
A. Correct.
Q. Before the shipyard in this case, Fairhaven, would do the work, they wanted some assurance about payment?
A. They started working, but they weren't getting paid as fast as they would like.
Q. And there was a period of cessation of work?
A. No. They never stopped working.

Page 117

Q. There was -- wasn't there a delay? Do you remember arguing with ACE about them paying the shipyard because the shipyard --
A. Yeah, I remember telling ACE, "Let's go. Get them their money." Because I wanted to get this thing fixed and back to work.
Q. How long a period of a delay was there before ACE was paying the shipyard?
A. I guess about a month.
Q. And in that month what work was the shipyard doing?
A. They had three or four men on there everyday burning, cutting, and --
Q. So they were going full scale?
A. I don't -- I don't run a shipyard.
Q. You've been in shipyards.
A. Yeah.
Q. Shipyards don't like to get too far ahead.
A. Yeah, right.
Q. Right?
A. Right.
Q. And there was a period where this was going on while ACE was --
A. Gayle can answer that better.
Q. What?

Page 118

A. Gayle can answer that better.
Q. Maybe you'll have her on the hot seat one day.
A. Oh, I'm dying for that day. I'm dying for that day.
Q. You were --
A. I got a few things I want to talk about. We'll get to that.
Q. Okay. You were involved with Fairhaven trying to get ACE to pay; Fairhaven telling you, we ain't doing X until we get paid, in a general sense, right?
A. They said they weren't -- no. They never stopped working, no. They wanted more money. They were on me to get ACE to get them more money. I had to get on ACE to get them more money.
Q. And there was no period of delay?
A. No. There was always men working on the boat.
Q. All right. Did they refuse to do anything?
A. No.
Q. Now, let's talk a little bit about the weekend of the Nor'easter.
When was the first you heard that there was a Nor'easter coming or expected?
A. I guess Saturday. No, no, no. Friday.
Q. Friday, the 13th of April?

Page 119

A. Yep.
Q. I assume that in your position as the owner of Hunt Marine, LLC, you have to track weather?
A. Absolutely.
Q. And do you subscribe to any sort of weather services or --
A. Yeah, we do. We do. But, you know, it was just calm, and I was watching it on the news. I was watching it. You know, I was well aware it was coming.
Q. And at that point in time you had your two tugs, Charlene and Patrick were at Senesco's Carrier Pier?
A. Yes, sir.
Q. Did you have any tugs that were working at the time?
A. Yes. Hunt Girls.
Q. Where was she working?
A. I think she was towing up from Louisiana.
Q. Did you have any other tugs working?
A. No, sir.
Q. Did you have any other tugs, period?
A. No, sir.
Q. So you had two in dock, two at Senesco's pier, and one towing up from Louisiana. And you were aware

that the Nor'easter was coming up the coast?
A. Yes.
Q. What, if anything, did you do to prepare for the Nor'easter?
A. We doubled up everything.
Q. When you say we, who are you talking about?
A. Me, Ben Peterson, Steve Barry. I have 37 years experience doing this. Ben has 25. Steve Barry has 40. And we had two deckhands, with probably two or three years experience between them.
Q. When you say you doubled up everything, what are you referring to?
A. All the ropes, all the lines on the boats.
Q. Which boats?
A. The two tugs at Senesco, Charlene Hunt and the Patrick J. Hunt.
Q. When did you do this?
A. Friday.
Q. What time on Friday?
A. I think it was around 1300.
Q. What time did you get to Senesco's pier on Friday, the 13th of April 2007?
A. I think it was later, about 1500. It was after we cleaned the hole out, because we cleaned the hole out all day. We got there -- well, I got there



probably about 9:00. But those guys had been working since 7:00. The boss can come in a little later once in a while.
Q. So you got there about 0900 hours?
A. I believe so.
Q. You had a crew on at that time?
A. Yeah.
Q. What would show who was working that day?
A. Payroll.
Q. That's the only thing?
A. They should be writing in the log, but they didn't do that, obviously.
Q. Let me take a look here.
A. Take a look, but I don't think it's there.
Q. So April 13th is the day we're talking about?
A. Yes, sir.
Q. And the log just says standby; is that correct?
A. Yeah.
Q. Who made that entry in the log?
A. I would imagine Ben Peterson.
Q. While the boat was -- the boat had been in -- the Patrick had been in at Senesco without work since March 22nd, right?
A. Yes, sir.
Q. You would not keep a full crew employed on a boat?



A. No, sir.
Q. Is that correct?
A. No, sir.
Q. I'm incorrect?
A. No, you're correct. Day work.
Q. What crew was involved in day work?
A. I just named them.
Q. Okay. Can you give that to me again?
A. Ben Peterson, Steve Barry, a kid John Stevenson, and I believe Ted Scanlon was there.
Q. Scanlon?
A. Yeah.
Q. And what time were they supposed to work?
A. Started at 7:30.
Q. 0730?
A. Yes, sir.
Q. And they would kick off at what time or end at what time?
A. 3:30, 4:00; eight-hour day.
Q. So about 1530 hours to 1600?
A. Yeah.
Q. So you had -- and what was -- Ben Peterson was the master?
A. Yes, sir.
Q. And Barry was what?



A. Chief engineer.
Q. And Stevenson was what?
A. Deckhand.
Q. And Scanlon?
A. Deckhand.
Q. That was the crew for the Patrick; is that correct?
A. That's correct.
Q. And was the Charlene also crewed that day?
A. No, sir.
Q. And you were also down at the boat at Senesco's dock that day?
A. Yes, sir.
Q. And you got there about 9:00 in the morning, correct?
A. That's correct.
Q. And you remember this day because you remember cleaning out the hull?
A. Hole, cargo hole.
Q. On what boat?
A. Patrick.
Q. What's the cargo hole?
A. It's the bow of the boat and below deck, and it's a big area about as big as this room that we keep all the extra ropes, and wires, and shackles, and

anything else we use on a tugboat.
Q. Was there a hatch that opens?
A. Yes, sir.
Q. And you climbed down into the hatch?
A. That's correct.
Q. And you cleaned it out?
A. Emptied it completely.
Q. Did you do the work or --
A. I supervised it.
Q. What does that mean?
A. I told them what to do.
Q. Well, you had a captain there. I assume the captain could tell them what to do.
A. Well, you know, I told him I wanted to get that done. That's one of the things I wanted to get done that day.
Q. Well, you certainly didn't have to be there to tell him to do that, right? I mean, these guys do work on your tugs all the time?
A. Yeah. I don't have to be there all the time, no.
Q. So were you there the whole day?
A. I don't remember.
Q. You don't remember how long you were there?
A. Right.
Q. Do you remember actually being there?



A. I was there, oh, yeah.
Q. So starting at 9:00 o'clock --
A. I remember tying the boats up at the end of the day.
Q. So you were there from 9:00 until 3:30, 4:00?
A. I don't remember. I was there at 9:00, and I was there at the end of the day. Was I in there in the middle of the day? I truthfully don't remember.
Q. You don't remember whether you left, went somewhere else?
A. I think I was there the whole day.
Q. If you weren't there, where would you be? Do you have an office that you work out of?
A. Yes, I do. I have a home office.
Q. Where was that at the time?
A. Where was it at the time? 25 Burnside Avenue.
Q. Narragansett?
A. Yes.
Q. And where else might you have been if you weren't there all day?
A. Might have gone and grabbed lunch. Might have been with my girlfriend.
Q. Who was your girlfriend?
A. That was a joke.



Q. Who is she?
A. Didn't have one.
Q. You didn't have one?
A. Not at the time, no.
MR. COLLINS: Don't make any more jokes.
Q. So you know you got there around 9:00, and you know you were there at the end of the day, whether it was 3:30 or 4:00. You may have come and gone during the day?
A. That's correct.
Q. And if you came and went, you can't really say where that would have been?
A. Lunch would have been involved.
Q. Okay. But where did you go for lunch? You can't say that?
A. I went to D'Angelo's.
Q. Where is that?
A. Right outside the gate, Quonset.
Q. Do you remember anything else aside from lunch?
A. Yeah. Medium steak, cheese, mushroom and unions.
Q. Are you being serious now?
A. I'm being serious.
Q. So you remember your order that day?
A. That's what I usually get.
Q. Who did you go to lunch with?



A. Myself.
Q. How long did it take to clean the hole out?
A. The whole day. From the time the men started until the time we finished.
Q. And what was down there that had to be removed?
A. A tremendous amount of equipment, ropes, wires, shackles, antipollution donuts, spill kits, a lot of equipment, a lot of rope. Mostly ropes, big ropes.
Q. Where was that stuff put?
A. Where was it placed?
Q. Yeah.
A. Right on the dock.
Q. Was it put in the storage container?
A. No. Right at -- right alongside the crew room, right alongside the wall of the crew room actually. That's where the tug was tied up. It was tied up right aside of it.
Q. What was the -- what's the phone number that you have for the phone you used for Hunt Marine at that time?
A. My cell phone?
Q. Yeah.
A. (401)640-6192.
Q. All right. Have you been made aware at all about

Mr. Ziegler's testimony in this case, anything he said?
A. Yes.
Q. And as a result, you understand that he said that on the 13th he made a call to you that you needed to come down to the dock to prepare the tugs for the impending storm; are you aware of that?
A. No.
Q. I represent to you that that's his testimony in this case, that that day he called you. He reached you, and that he told you you needed to come down and prepare the tugs. Did that occur?
A. No, sir.
Q. So you were already there. There was no reason for him to call you; is that correct?
A. That's correct.
Q. And that never occurred?
A. (Witness shaking head negatively).
Q. Correct?
A. That never happened the whole time I was at Senesco, no.
Q. And if you were already there, there was no reason for Mr. Ziegler to call you that day, right?
A. That's correct.
Q. And if the phone records indicate that he called



you that day, that's a mistake in the phone records?
A. It surely wasn't to prepare my boats for a storm that was two days away.
Q. Did he call you that day?
A. I don't recollect, sir.
Q. If he called you, what did he call you for?
A. I don't think he did, sir, but I don't recollect.
Q. So Ziegler did not call you, and Ziegler did not call you to tell you to prepare your boats, correct?
A. To my best knowledge, correct.
Q. What do you mean, to my best knowledge? You're saying you were there.
A. I said I know he didn't tell me to prepare my boats. Did he call me? I don't know.
Q. Why else would he --
A. I don't know.
Q. Why else would he call you?
A. I don't know, sir. I don't think he did. I'm trying to tell you that. I don't think he did.
Q. He also testified in this case that what happened was someone from Hunt Marine, who he didn't know, showed up late in the day while he was closing up, closing the pier up, and went down and looked at



the boats. Do you understand that?
A. Yeah, that wasn't that day.
Q. That didn't happen on Friday, the 13th --
A. No, sir.
Q. -- of April 2007?
A. No, sir.
Q. Did it happen another day?
A. I believe it happened on Sunday.
Q. Two days later?
A. Yes, sir.
Q. So on Sunday, the 13th, 2007, did Ziegler call?
A. The 15th you mean?
Q. The 15th. Sunday, the 15th, did Ziegler call and ask you to send someone down?
A. No, sir.
Q. Someone was just sent down to check the boats?
A. Yes, sir, by me.
Q. But you had doubled the lines up?
A. Yes, sir.
Q. On Friday?
A. Yes, sir.
Q. When you say doubled the lines up, can you explain what you mean? If I'm not mistaken, the Patrick which was the smaller tug, was tied bow out to the bay, directly to the dock; was that correct?



A. Yes, sir.
Q. And the Charlene was breasted to the Patrick; is that correct?
A. That's correct.
Q. Is that how the boats were tied up when you left there 3:30, 4:00 o'clock on Friday, the 13th of April 2007?
A. Describe them again.
Q. Patrick to the dock, facing bow out to the bay; Charlene breasted to the Patrick.
A. That's correct.
Q. You saw that when you left that day?
MR. COLLINS: Friday?
MR. ZONGHETTI: Friday, the 13th, 3:30, 4:00 o'clock in the afternoon.
A. Yeah. I tied them up, yeah.
Q. You were actually involved in tying the boats up?
A. Absolutely.
Q. The lines out from the Patrick to the dock, can you describe what lines were out when you left there on Friday, the 13th?
A. Two head lines, two side lines, and two stern lines, double -- double head line from Charlene to the Patrick; a line from Charlene's bow to the dock, Charlene's stern to the dock; double line

Page 132

from the Charlene's stern to the Patrick, and double side line.
Q. So if I have this correct, the Patrick had a line from its bow out to Senesco's dock?
A. Right.
Q. Is that correct?
A. That's correct.
Q. And that would be a line from the bit on the bow of the Patrick to a chock on the dock?
A. I believe it was a bollard.
Q. A bollard on the dock?
A. Yes.
Q. And that line was doubled?
A. No, that line was single.
Q. So that was a single line?
A. That was a single line.
Q. And was that a -- what size line was that?
A. A seven-inch.
Q. Circumference?
A. Yeah, circumference.
Q. And from the stern of the Patrick -- from the stern bit of the Patrick there was a line that ran also to the dock?
A. Yes.
Q. And it ran to what, a bollard or a bit?

Page 133

A. I believe a bollard again.
Q. Was that line doubled?
A. Single.
Q. Single. And then did you have spring lines out?
A. Double, two.
Q. You had two spring lines out?
A. Two spring lines.
Q. One running fore, one running aft?
A. Right. And two bow lines from the Patrick to the bollard on the dock.
Q. I thought I just asked you that. You said --
A. No, you said the Charlene.
Q. No, I didn't say. Let's go back. Let's go back. Were your answers all just about the Charlene?
A. Yeah, you said the Charlene, the outside boat.
Q. Let's go back to make sure we're clear.
A. Okay.
Q. Patrick was to the dock?
A. Right. She had two, two and two. She had six --
Q. I want to make sure this is clear on the record. It's important. I want to make sure this is clear.
A. Very good.
Q. On April 13, 2007, Friday, the 13th, when you left, this is the configuration we're talking

Page 134

about.
A. Yes.
Q. You got it so far?
A. Yes, sir.
Q. Okay. Patrick to the dock facing out, bow to the bay, had a bow line out?
A. Two bow lines.
Q. It had two bow lines out?
A. Two bow lines.
Q. Were they two separate lines or was it sort of a double turn, like a turn around the bollard coming back and coming back?
A. You mean two parts.
Q. Two parts.
A. No. She had two separate lines.
Q. And were they off the same bit on the bow --
A. Yes.
Q. Let me finish. -- off the same bit on the bow of the Patrick?
A. Yeah, one made fast on the stem, one made fast on the main towing bits.
Q. So that one was from the stem, one was from the towing bit?
A. Yeah, around the stem. You put one out back to the stem. The other one goes out around the stem,

Page 135

back to the towing bits, two.
Q. But there were two lines off the bow to the dock?
A. Yes, sir.
Q. Two separate lines?
A. Yes, sir.
Q. There were two lines off the Patrick's stern to the dock?
A. Yes, sir.
Q. Two separate lines?
A. That could have been two parts.
Q. Same line, two parts?
A. I believe so.
Q. But nevertheless, doubled up?
A. Absolutely.
Q. And then you had two spring lines?
A. Two spring lines, two separate ropes.
Q. And were they doubled up?
A. The Patrick -- I remember the Charlene had two. The Patrick had -- her spring line was two parts, a big rope; two parts, one rope.
Q. So you had a forward running spring line and an aft line spring line?
A. No. An aft run spring line, that's it, two parts.
Q. One spring line, two parts?
A. That's correct.

Q. So if we start at the stern, you had one line there in two parts?
A. Right.
Q. You had one spring line, two parts?
A. Right.
Q. Which could only run one direction, right?
A. Right, that way (indicating).
Q. Aft?
A. Yes, sir.
Q. And you had two bow lines?
A. That's correct.
Q. And that was more lines than you would normally put out; is that correct?
A. Yes.
Q. And that was because of the impending Nor'easter; is that correct?
A. That's correct.
Q. And that was because you wanted to make sure you had the proper amount of lines out?
A. Right.
Q. And in your judgment of 30 something years –
A. Thirty-seven.
Q. -- 37 years on tugs -- you're a master?
A. Yes, I am.
Q. You currently have a master's license?



A. Yes, I do.
Q. That was your judgment as to what was required -- just talking about the Patrick; we'll get to the Charlene -- to meet the storm?
A. Yes, sir.
Q. And you understood it was your job to tie the boats up properly, right?
A. My boats.
Q. Your boats. You are the master, or you were a master. And a master is in charge of his boats, including tying them up, right?
A. Yes, sir.
Q. The Charlene was breasted outboard of the Patrick; is that correct?
A. Yes, sir.
Q. It was heads to heads?
A. Heads to tails.
Q. So the bow of the Charlene was facing to the shore?
A. Yes, sir.
Q. Are you certain of that?
A. Positive.
Q. Okay. And the Charlene, did it have any lines out to the dock?
A. Yes. A bow line and a stern line.



Q. So the Charlene had two lines out from the Charlene directly to the dock; is that correct?
A. Single hose, just one part.
Q. One line, one part?
A. (Witness nodding head affirmatively).
Q. But you had a bow line and a stern line, correct?
A. Right. But then --
Q. In addition to the bow line and the stern line --
A. Right.
Q. -- that went from the Charlene to the dock --
A. Stem to the dock; main towing bits to the Patrick, two parts, to the bow of the Patrick.
Q. I just want to make sure I'm clear.
A. Go ahead.
Q. So we're going to do it slower and more broken down in layman's terms.
A. Go ahead.
Q. The Patrick, its bow was facing out into the bay?
A. That's correct.
Q. And you've described how it was tied up?
A. That's right.
Q. The Charlene was heads to tails, so its bow was facing to the shore?
A. Right.
Q. And its stern was facing to the bay?



A. Right.
Q. Was it positioned that way because the storm was coming?
A. No. No, I don't think so. I put them -- where I put them, I put the tugs, I put on purpose. I put them astern of the drydock to get a lee. I had been in there plenty of times in plenty of storms; nothing, nothing even close to what we had.
Q. So you actually positioned the boats there that day?
A. Yes.
Q. Were the boats under their own power, able to maneuver that day?
A. Yeah. The Patrick had one engine.
Q. Did you have to move them from somewhere else that day to put them where you put them?
A. No, they had been there. The only thing we did was flop them around when we cleaned the hole.
Q. What did you flop around?
A. The tugs.
Q. What do you mean by flopping around?
A. We decided to clean the hole Thursday.
Q. You moved --
A. We spun them.
Q. You moved the Patrick into the dock?

A. That's correct.
Q. Charlene outboard?
A. Right, for the reason of cleaning the hole out.
Q. But you positioned -- that was the best position for them on the dock for the storm?
A. Yes, no doubt about it.
Q. And you knew that?
A. Yes, I did.
Q. You made sure they were there for that reason?
A. That's right.
Q. The heads to tails was not because of the storm; that was just how they happened to be tied up that day?
A. Right. But, you know, it varies what's the best way for them to be tied up.
Q. So the heads to tails was the best way for them to be tied up; is that correct?
A. That's the way they were tied up.
Q. Was it the best way to weather the storm?
A. In my feelings, if we had put more rope out, had been warned of the severity, none of that would have happened.
Q. None --
A. It wouldn't have broke loose. If Ziggy had told me at 2:00 o'clock when I called him, "Kevin, you



better get down here," I would have got down there. I had 20 ropes, big ropes from me to you to the bow of that tugboat. It would have took a guy with my kind of experience about 20 minutes to put more rope out.
I'm just getting to the bottom line here. I know we're doing all this other stuff, but the bottom line is the tugs should never have broke loose.
Q. You could have prevented that?
A. Yes, I could have.
Q. And if Ziggy would have told you at 2:00 in the morning, "You gotta come down here" --
A. I would have came.
Q. -- you would have come, and you would have prevented the tugs from breaking loose?
A. Absolutely.
Q. Bottom line is you should be able to tie the tugs up so they can weather the storm?
A. But they were tied up extremely to weather the storm that they were predicting.
Q. Okay.
A. The storm they were predicting, the tug was overly tied up.
Q. And then the storm, as it hit, if you had been



called and told to come down, you could have tied the tugs up better?
A. Right. Because where I was, I was nervous. The wind was blowing, everything else. I said, "Hey, do you want me to come down?"
"No, man. Everything is cool. Don't worry about everything. Stay in bed. Don't worry about all that crap."
Q. We'll get to that.
A. I know.
Q. I know you know. We're going slow and screwing things up, but we'll get there.
A. That's all right. I guess --
Q. We get paid by the hour. You know the routine.
MR. COLLINS: Do you want to take a break?
THE WITNESS: No, I'm fine.
Q. We're going to stop in a few minutes to give the court reporter a break. We promised at 3:00 o'clock we would.
A. I'm not trying -- you know, I'm not trying to be rude. I'm not trying to be a jerk.
Q. You're not a jerk.
A. It's just that --
Q. I've been through this a million times.
A. I know. I know. I haven't.



Q. It's no problem here.
You've been through that before?
A. I never had tugs break loose.
Q. Did you ever have your deposition taken?
A. Yeah.
Q. Okay. So getting back to the Charlene, it had a single line out from its bow to the dock. It had a single line out from its stern to the dock.
A. Two parts.
Q. Both lines were two parts or just the stern line?
A. The Charlene?
Q. Yeah.
A. Oh, no. Singles going to the docks.
Q. And then it had lines tying it to the Patrick?
A. That's correct.
Q. What lines did it have out to the Patrick?
A. Two. Two parts, bow to Charlene to the towing bits on the Patrick J.
Q. Okay.
A. Okay?
Q. So it had a two-part line. It had a line in two parts out from its bow to the towing bits of the Patrick?
A. That's correct.
Q. What else did it have out?

Page 144

A. It had two separate single-part spring lines.
Q. Okay.
A. I remember one was all different colors. You know, we were using -- everything we possibly had we put out. You know what I mean? We knew weather was coming. We just --
Q. So three lines from the Charlene to the Patrick?
A. No. Then from the stern of the Charlene to the side bits on the bow another two parts, big rope.
Q. So four separate lines, two in two parts?
A. Right.
Q. Did you see Steve Tholander that day?
A. 6:00 o'clock in the morning I did.
Q. Where?
MR. COLLINS: What day is this?
MR. ZONGHETTI: On the 13th, Friday.
A. Oh, oh, oh. Did I see Steve? Yeah.
Q. You did?
A. Yeah, I believe I did. Yes.
Q. You talked to him that day?
A. Yeah.
Q. Talked to him about the storm?
A. Not really.
Q. When did you see him that day, do you recall?
A. I believe in the morning when I was walking to the

Page 145

boats.
Q. Did you see him later that day?
A. I don't remember.
Q. Did you see Silvio that day?
A. I would have to say probably, yes.
Q. Did you see Ziggy that day?
A. Yes.
Q. Did you see Mike Foster?
A. No.
Q. Okay.
MR. ZONGHETTI: Why don't we take a break.
(Whereupon, a brief recess was taken at 2:49 p.m., and the proceedings resumed at 3:05 p.m.)
MR. ZONGHETTI: Why don't we have this marked.
(Plaintiff's Exhibit 8 for I.D.: Copy of phone records for Hunt Marine I, LLC, Invoice dated April 28, 2007).
Q. I'm going to show you a copy of phone records from Hunt Marine that were produced to us in this lawsuit.
Does Hunt Marine have several phone numbers that it does business with?
A. Yes.

Page 146

Q. Yes?
A. Yes.
Q. And you use Nextel?
A. Yes, sir.
Q. And I'm going to direct your attention -- I put a tab on there, and if you could open up to that. You don't have to pull it out; just open it up.
(Witness complies).
Okay. There we go. That tab is to the phone number -- if you look at the top there, it's for 401 --
A. That's my cell.
Q. -- 640-6192. That's yours, the one you carried?
A. (Witness nodding head affirmatively).
Q. Is that correct?
A. That's correct.
Q. There's another one, and I'm just -- just kind of a general question -- 3104 ending?
A. Where?
Q. It's not on that page. It's on the - sort of in the front, one of the cell numbers that's on this bill. Yeah, 3104 ending?
A. Yes.
Q. Whose phone is that?
A. My girlfriend's.

Page 147

Q. Your girlfriend?
A. Yes.
Q. Yvette?
A. Yvonne.
Q. Yvonne. Okay. And she had a Hunt Marine phone?
A. Yeah.
Q. Did she work in the company or it just was sort of a perk?
A. She works in the company.
Q. And what does she do in the company?
A. She goes out with me.
Q. Goes out with you?
A. Yeah, I mean, you know, it's a perk I guess.
Q. Okay. It's not the end of the world. I'm just asking.
A. Well, I don't know why. I'm kind of lost here.
Q. If we go to where I tabbed it --
A. Yeah. What's your first name again?
Q. My name?
A. Your name.
Q. It's Zonghetti, Z-O-N-G-H-E-T-T-I.
A. Zonghetti?
Q. Yeah.
A. Well, my question to you is what does my girlfriend's name got to do with a storm wiping

Page 148

out tugboats?
Q. I don't know. We'll see if it has anything to do with it.
A. Okay.
Q. If you go to where I tabbed it, that's an entry for April 13th, 2007. There's an incoming phone call at 12:43 p.m. Do you see that?
A. Where?
Q. Yeah, right at the top line, I believe.
A. 4/13? Incoming. Yeah, I see it.
Q. And then phone number that it came in from, 692-1451. Do you see that?
A. Yes, sir.
Q. Do you know whose phone that is?
A. No, I don't.
Q. I represent to you that that's William Ziegler's cell phone that was issued to him through Senesco.
A. Okay.
Q. And do you recall him calling you on Friday, the 13th of April at about 12:43 in the afternoon?
A. No, sir.
Q. You were at the dock though that day, right?
A. Yes, sir.
Q. And do you recall speaking to him by telephone that day?

Page 149

A. I might have. I don't remember, sir.
Q. Did you call him back that day?
A. I don't think so, sir.
Q. Because you were at the dock?
A. Because I did -- I think I did all my talking to him on Sunday. I could be wrong, but I think it was on Sunday.
Q. And you certainly don't recall him calling you to tell you about a storm and you had to send someone down?
A. No, sir.
Q. If you go down that same page to -- it's number 1959. They have numeric numbers that log your calls, calls in and calls out.
A. I got it.
Q. Do you see 1959?
A. Yeah. Cumberland, Rhode Island.
Q. And that's a call to Ziggy by you at 12:21 p.m. Do you see that? It's to that 1451 number.
MR. COLLINS: That's 2:21, isn't it?
MR. ZONGHETTI: 2:21, I'm sorry.
Q. 2:21 p.m. It's from your number. It's to 692-1451. Do you see that?
A. Okay.
Q. And that's a four-minute conversation, four-minute

Page 150

call?
A. Okay.
Q. Does that refresh your memory that you did call him that day?
A. No, sir.
Q. Why would you be calling him? I mean, he worked on the dock, right?
A. That's what I'm trying to explain to you. I don't recall. I don't honestly recall.
Q. But let's just kind of reconstruct the scenario you've presented that you were down there that day; you were working, supervising cleaning of the hull - the hole. You were later on involved in the tying up of the boat. But Ziggy was a guy who worked on the dock, right?
A. Right.
Q. You're calling him 2:21 p.m. that day, presumably returning a phone call he had made to you earlier that day. Does that make sense to you?
A. Okay.
Q. You weren't at the dock at 2:21 p.m., right?
A. It says I was in Cumberland. Is that Cumberland?
Q. It says call to Cumberland.
MR. COLLINS: That's call to Cumberland.
A. Who was in Cumberland, Ziggy?

Page 151

Q. Well, that's just where the phone is registered to. Do you understand that?
A. No. Explain that to me.
Q. Did you have any reason to call Ziggy that day?
A. Not that I recall. Sunday I did.
Q. Okay. Didn't speak to him, as far as you can remember, and had no reason to, right?
A. Nope.
Q. So when you left the boats on Friday, the 13th, they were tied up the way you've testified to. And as far as you were concerned, they were tied up sufficiently to weather the storm that was coming?
A. Yes, sir.
Q. And you did not dispatch someone down to the dock at Senesco in response to a phone call from Ziggy that you should send someone to tie up the boats; that just didn't happen, correct?
A. To tie up the boats?
Q. Tie them up securely.
A. They were already tied up.
Q. So you didn't send someone down?
A. No. I sent somebody Sunday to check on things.
Q. All right. By the way, you're not blaming Senesco for the damage to your boats, are you?

Page 152

A. Am I blaming Senesco for the damage to my boats?
Q. Yes.
A. Is Senesco blaming me for the damage to their dock?
Q. Focus on my side, my question, not yours.
MR. COLLINS: Just answer the question.
Q. Or is that your answer?
A. What was the question again?
Q. You're not blaming Senesco for the damage to your boats, right?
A. No, I'm not.
Q. And that's because you were the guy responsible for tying them up, right?
A. Yeah, I'm the guy responsible for tying them up.
Q. So Senesco wasn't responsible for tying them up, and you're not blaming them, right?
A. I'm not going to answer that right now.
Q. You can't answer it?
A. I'm going to think about it.
Q. Well --
A. I would like to confer with my attorney. Can I do that?
Q. To answer the question?
A. Yeah.
Q. No, you really can't.

Page 153

A. Okay. Okay. Let's go on.
Q. What's the answer?
A. I'm not going to answer that question right now.
Q. We'll wait until you can figure out the answer. Because we're here today. This is the third time up. You should have had plenty of time to think about your answers.
A. Not my fault this is the third time up. I know you think it is, but it ain't.
Q. You're not under the influence of Percocet today making you groggy, right?
A. Do I look groggy to you?
MR. COLLINS: Can you read back the question?
Q. You can't answer the question, and I'm trying to figure out why.
THE WITNESS: Read back the question, please?
MR. ZONGHETTI: Read back the question.
(Whereupon, the requested portion of the record was read back by the court reporter as follows:
"Q. So Senesco wasn't responsible for tying them up, and you're not blaming them, right?")

Page 154

A. What did I answer?
Q. The first time you answered correct. And then you said you weren't going to answer it.
A. Well, that's what I don't understand. Why did you ask me twice? I answered correct.
Q. You're sticking with your first answer?
A. Yeah, let's stay with correct.
Q. Okay. You're not blaming them. All right.
MR. COLLINS: Now do you want to confer?
THE WITNESS: Yeah.
MR. COLLINS: Okay. That's fine.
MR. ZONGHETTI: Just let the record reflect they're going to take a break and confer.
(Whereupon, a brief recess was taken at 3:16 p.m., and the proceedings resumed at 3:17 p.m.)
THE WITNESS: All right.
MR. ZONGHETTI: Okay?
THE WITNESS: I would like to rephrase that then. I didn't understand you. Now I do understand you.
Q. Wait, wait. What do you want to rephrase, your answer to the last question?
A. Yes, sir.
Q. So you've now gone out in the hallway; you've

Page 155

spoken to your attorney, and now you want to rephrase a question?
A. That's correct.
Q. Or rephrase an answer?
A. That's correct.
Q. Okay. Go ahead.
A. I am blaming Senesco for the damage to the vessels. Senesco had four men on the dock that night. I had secured my tugs with great detail to weather any storm. The storm came in very severe. I called about the storm, was told, "Don't worry about it. Stay in bed." I didn't stay in bed. I worried about it. But I was told everything was secure.
I would have came down and secured the tugs with my ropes that were on the dock and none of this would have happened. That's why.
Q. Okay. In addition to what you just said, are you blaming Senesco for anything else?
A. No, just the damage to the boats.
Q. No, I don't mean the damage to the boats. You've described, if I'm not mistaken, what supposedly Senesco did wrong; is that correct?
A. That's correct.
Q. Is there anything else that you're claiming they

Page 156

did wrong that supposedly caused damage to your boats?
A. That Senesco did wrong to cause damage to my vessels; is that correct?
Q. Yes.
MR. COLLINS: He's asking is there anything else besides what you just said.
A. Well, they had -- Senesco had men there for the purpose of keeping eye on all the equipment. They saved every piece of equipment in that yard. And every piece of equipment in that yard broke loose, two Reinauer tugs and four barges.
And they put every one of those back to the dock with no problems. When it came to Hunt's boats, they didn't care, and they let them go.
Q. Anything else that you're faulting Senesco for, any other fault that you ascribe to Senesco for the damage to your boats?
A. No. That's it.
Q. Did you go to the dock on Sunday -- on Saturday, the 14th?
A. I don't recall.
Q. Did you send anyone to the dock on Saturday, the 14th?
A. I believe I sent somebody on the 15th, Ted

Page 157

Scanlon.
Q. Just focus on my question. We'll get to the 15th.
A. Okay.
Q. The 14th.
A. I don't believe so.
Q. Well, you say payroll records will show who worked on the 13th, on April 13th?
A. That's correct.
Q. Will they show who was paid that day or will it show what they were doing, or both?
A. No. It will show their hours. Won't describe what they're doing.
Q. And what payroll records do you have that will show their hours? Is there some log? Is there some piece of paper? How does it work?
A. There's a payroll log.
Q. On the 15th of April, 2007, did you go down to the -- did you go down to the pier, Senesco's pier?
A. I don't recall, but I probably did because I always took a ride on Sundays; took a ride on Saturdays, too. I always took a ride back and forth checking on everything. But do I recall? No.
Q. Do you recall --

Page 158

A. I recall ordering one of my men down there late in the afternoon.
Q. Okay. Let me ask you this. You tied up those boats on Friday, the 13th, the way you've described, doubling some of the lines, putting lines out from the Charlene directly to the dock because of the impending storm, right?
A. That's correct.
Q. If you had failed to take those actions, if you had failed to double lines up, if you had failed to put lines out from the Charlene directly to the dock, would you have not done what was required of you under the circumstances?
MR. COLLINS: Are you saying --
A. Rephrase the end a little bit differently.
MR. COLLINS: Are you saying on the 13th or just before the storm?
MR. ZONGHETTI: On the 13th.
A. Yeah, before the storm.
Q. Before the storm you took certain actions, right?
A. Friday afternoon tied the tug up, right.
Q. And you tied it up especially to weather the storm, right?
A. Yes.
Q. You doubled some of the lines, which you normally

Page 159

don't do, right?
A. No. We -- the tug was tied up extra special.
Q. Extra special. And in the way you've described?
A. Yes, sir.
Q. Normally, for example, you wouldn't have lines out from the breasted tug directly to the dock, right?
A. That's correct.
Q. And normally, you wouldn't double up lines?
A. Yeah, we might. We might.
Q. Which lines would you double up?
A. Depending. You know, sometimes you just feel like throwing out a two bow line.
Q. But normally you don't do it?
A. Normally you don't need to, no.
Q. So you did those things especially for the storm, right?
A. Right.
Q. If you hadn't done those things or taken action like that, and the boats had been damaged -- I understand you say you did. If you hadn't done those things, would you have been at fault?
A. Me at fault?
Q. Hunt Marine.
A. Hunt Marine was never at fault, no.
Q. Even if you hadn't doubled the lines up?

Page 160

A. If we had just tied up regular, not knowing there was a storm coming, the storm just blew in, would it have been my fault, no.
Q. But that's not the circumstance here. You've testified you knew the storm was coming, right?
A. Senesco had people there.
Q. Forget Senesco. We'll get to that. I'll give you any chance you want. We'll get to that.
You knew on Friday, the 13th, the storm was coming, right?
A. I knew a storm was coming. The severity I didn't know.
Q. No one can know until it hits.
A. That's right. Very good.
Q. But that goes to the job --
A. We're finally getting somewhere.
Q. That goes to the job of the master though. You have to use your best judgment based upon the information you have.
A. Well, we've had storms in there, big ones. Nothing like that. That was -- old-timers were there that said they never seen anything like that.
Q. But if I have you correctly, if I've got what you're saying here, what you said was if I had

Page 161

known, if Ziggy told me to come down at 2:00 in the morning on the 16th, I would have come down there and tied it up good enough so it wouldn't have broken loose?
A. That's correct.
Q. If -- from what I gather from that, you're saying you could have tied the tugs up sufficiently to weather the storm, except for Ziggy supposedly telling you what you told - what he told you?
A. I could have put a hell of a lot more rope out.
Q. Let's go back to Friday, the 13th.
A. Okay.
Q. You took steps on that day so that the tugs would be tied up sufficiently to weather what was an anticipated storm?
A. That's correct.
Q. If you hadn't taken those steps, could you be faulted, you being Hunt Marine?
A. Hunt Marine faulted, no.
Q. You get information Nor'easter is coming, right? You don't do anything at all. You don't double the lines up. You don't do anything.
A. Correct.
Q. Will Hunt Marine have some fault?
A. Yes, I agree.

Page 162

Q. Yes?
A. Yes.
Q. Did any thought go into -- I think I may have asked you this. Let's cover it one more time if I did.
The positioning of the tugs, whether the smaller one should have been in closer to the dock or the larger one should have been in --
A. No, because we had done work, and we still had more work to do to the Patrick.
Q. So the positioning of the tugs in relation to the storm wasn't thought of?
A. No. It shouldn't have been any problem. There shouldn't have been any problem. What happened was Pandora's box happened. One broke, and they all started breaking.
Q. On Sunday, the 15th, you dispatched someone down to the dock?
A. I believe so. I believe it was the 15th. Ted Scanlon.
Q. Who was he again?
A. A deckhand.
Q. Where did he live?
A. He lives close, Wickford.
Q. What time did he go down there?

Page 163

A. I believe he went down there about 3:30, 4:00 o'clock.
Q. Was anyone there?
A. He never told me. He said, "Everything looks fine."
Q. Was Scanlon one of the guys who had a Nextel phone?
A. (Witness shaking head negatively).
Q. No?
A. He had his own phone.
Q. But you would have called him off your company's - the one that was assigned to you, the Nextel?
A. Yes.
Q. So did you call him that day at home and tell him to go to look down?
A. Yeah, I would imagine so. What the hell is his number?
Q. Do you remember his number?
A. I'm getting it for you.
Q. What's that?
A. I'm getting it for you.
Q. Oh, there you go.
A. That will tell us. That will tell us whether, you know -- 215-7504.
Q. All right. So it looks like -- and where did you

Page 164

get that number from? Is that dialed into your phone?
A. Yeah.
Q. Looks like Scanlon called you at 10:17 in the morning on that day, on 4/15.
THE WITNESS: Where is it?
MR. COLLINS: Right there (indicating).
THE WITNESS: Yeah, that's Teddy right there. Did I call him? I might have called him the night before. Here he is right here. Yeah, right here. See? I called him right there, 4/14.
MR. COLLINS: Where is that?
THE WITNESS: Right there, 4/14. Oh, that ain't it. Right there, 215 on the 14th. See that?
MR. COLLINS: Do you see it, Mr. Zonghetti? 4/14 at 5:43. That's incoming.
THE WITNESS: He called me.
MR. COLLINS: Yeah.
Q. He called you on the 14th, which was the Saturday?
A. Yes.
Q. Do you know what you talked about?
A. No, sir.
Q. On the 15th you called him; you spoke to him a

Page 165

couple of times?
A. Yeah, I believe so. Yeah.
Q. In the morning there's an incoming call?
A. There's another one on the 14th.
Q. Well, did you send him down on the 14th?
A. Like I said, sir, I was almost positive it was the 15th.
Q. All right.
MR. COLLINS: You called him at 2:03 on the 14th.
THE WITNESS: Well, it could have been then.
Q. It could have been a lot of things. I mean, there's phone calls and you don't know --
A. That's what I'm saying. I mean, you know. I mean, --
Q. We'll go on to the next question.
A. -- my memory is not like when I was a kid. Whose is?
Q. Did you talk to Ziggy on the 15th?
A. Yes.
Q. Sunday?
A. Yes, I did.
Q. And why did you talk to Ziggy on the 15th?
A. To tell him, "Hey, Zig, there's a storm coming,

Page 166

big storm." I believe that was around 3:30, 4:00 o'clock.
Q. And for what reason were you talking to him about the storm?
A. I just wanted to see what Senesco's plans were.
Q. And what, if anything, did he tell you?
A. That him and Silvio were going to be on the dock from 7:00 to 7:00 in the morning.
Q. 7:00 at night till 7:00 in the morning?
A. Yes, sir.
Q. Did he tell you anything else?
A. No. That they were going to be there to watch all the equipment.
Q. And that was it?
A. And knowing them, and knowing who they are and how they work, I felt pretty confident.
Q. Confident of what?
A. That they were going to watch everything.
Q. So what did that mean to you, that they were not responsible for your boats, right?
A. Well, I was paying wharfage. They rescued everything else in the place. Why didn't they rescue mine?
Q. Focus on this. Did you have any discussions with them that they were going to do anything for your

Page 167

boats?
A. Yeah, they were going to take care of it he told me. "Don't worry about it, Bro."
Q. They said they were going to take care of your boats?
A. "Don't worry about it, Bro." I'm telling you what he said.
Q. What did that mean?
A. He's got it.
Q. What does that mean?
A. That means I've got it handled; you don't need to come down here.
Q. When did he say that to you, 3:00 o'clock in the afternoon?
A. No, he said that to me about 2:00 o'clock in the morning.
(Interruption by the court reporter).
Q. I said he said that to you about 3:00 o'clock in the afternoon. And you said no?
A. 3:00 o'clock in the afternoon is when he told me -- is when we talked about the storm, and he told me that him and Silvio were going to be there from 7:00 to 7:00.
Q. Okay.
A. And that's basically what we talked about.

Q. Okay. You then talked to him next 2:00 in the morning?
A. Yes, sir.
Q. Before you talked to him at 2:00 in the morning on the 16th --
A. Yeah.
Q. -- did you receive any phone calls from anyone at Senesco?
A. No, sir.
Q. Did you receive any phone call from Steve Tholander?
A. The next morning, 5:00 o'clock in the morning, 4:00 o'clock. I don't know exactly what the message was left because -- let me tell you my scenario and then you can chew it up all you want, do anything you want with it.
But I talked to Ziggy around 2:00 o'clock. I stayed up another hour and a half. I started -- you know, I had to sleep sometime. I put the phone on vibrate, and I went and laid down.
I went and got up to go to the bathroom at 20 past 5:00, and I saw the phone flashing. While I was going to the bathroom I played the messages. And it says, "You have seven saved messages." And I went, "Uh-oh, something happened."



So as the messages were being played, I was getting dressed. Steve was probably the fourth saved message. And there was a message from Mike Foster also, "Kevin, you better get down here."
The first two calls were from Ziggy that, "Hey, Bro, things are getting bad. Things are getting rough." Still no mention of coming down there. Steve didn't tell me to get down there. Mike Foster -- that's when the Charlene broke free. That was about 5:00 o'clock in the morning.
Q. Okay. Let's go back a little bit.
You just said, if I have it correctly, there were two messages from Ziggy saying things are getting bad, getting rough?
A. I believe so.
Q. Okay. Those were two messages that you saw on your machine when you got up at 5:00 in the morning?
A. About 20 past 5:00.
Q. What time were those messages left?
A. I don't know, sir.
Q. No idea?
A. No, sir. Between 3:30 and 5:20.
Q. Okay. So 3:30 a.m. on the 16th and 5:20 a.m. on the 16th?



A. Approximately. Approximately, you know. I don't know exactly what time my eyes shut off, but.
Q. You had a message from Steve Tholander?
A. Yes, sir. That was about the fourth message.
Q. What time was that left?
A. Again, between that time period.
Q. 3:30 and 5:20 a.m.?
A. Yes, sir.
Q. And you had a message from Mike Foster?
A. That was probably the sixth call.
Q. Tholander in his message, which you say was between 3:30 and 5:20 a.m., did he say to you you had to come down?
A. I'm trying to think.
You have to understand I was already getting dressed. It didn't really matter what anybody was saying. I was getting dressed.
Yeah, I believe he did. Yeah, I believe -- I think Steve said, "You gotta come down." I know Mike did. I know Mike did. I'm not positive about Steve.
Q. All right.
(Plaintiff's Exhibit 9 for I.D.: One-page color-coded telephone log dated April 15 and April 16).



Q. I'm going to show you an exhibit marked as Plaintiff's 9. And it's a compilation of phone calls in and out of your line. And your line was -- I'm sorry. It's a compilation of phone calls in and out of your lines as put together from your phone records and the Senesco records. And I want to go through this with you.
MR. COLLINS: This is from both records?
MR. ZONGHETTI: Both records.
A. From Senesco and me, right?
Q. Yeah. Your line was 401-640-6192?
A. That's correct, sir.
Q. Starting on April 15th do you see the pink part of this exhibit?
A. Yes, sir.
Q. The pink part of this exhibit shows phone calls off of Hunt lines. On the left you have the number making the call. On the right you have the number the call was to. Do you see that?
A. The pink here?
Q. That's who is making the call.
A. Okay. And coming to me, right?
Q. Well, coming to those numbers.
A. Coming to these numbers?

Page 172

Q. Yeah.
MR. COLLINS: No.
Q. On the left is the number making the call.
A. Right.
Q. On the right is the number receiving the call.
A. So it was me sending to -- no, it couldn't be.
Q. Just take a look. These are the numbers that were making the calls (indicating).
A. Yeah.
Q. These are the numbers receiving the calls (indicating).
A. Okay.
Q. Do you have it?
A. I got it.
Q. So if we go to the top, for example, in the yellow you have Ziegler calling your phone number, 6192, three times on April 15th. Do you see that? 10:10 a.m., 5:19 p.m., 7:55 p.m.
A. Okay.
Q. Is that -- do you recall any of those calls?
A. I think I recall this one.
Q. Which one? I can't see that.
A. 7:55.
Q. Ziegler has testified that he called you to tell you what was going on at the dock. "We're going

Page 173

to be working. We're going to be down here." Right?
A. Yep.
Q. And that's consistent with your recollection?
A. Yes. "Everything is fine. Nothing is happening."
Q. And also consistent with your recollection is the storm didn't kick up until the late hours of April 15th and the early morning hours of April 16th?
A. Oh, yeah, like 4:00 o'clock in the morning.
Q. All right. Now, if you go to the pink on that page --
A. Yeah, got ya.
Q. -- April 15th, for example, at 8:28 p.m., 6192, that's your line, right?
A. Where's this?
Q. If you go right up here (indicating).
A. Yeah.
Q. All right. April 15th, 8:28 p.m., your line, 6192, and you're calling 3104. Do you see that?
A. Yes.
Q. And that -- I think you explained that that was your girlfriend, right?
A. Yes.
Q. Okay. And then 9:52 your girlfriend is calling

Page 174

you, right?
A. Yes.
Q. 9:59 your girlfriend is calling you?
A. Yep.
Q. 9:59 again your girlfriend is calling you?
A. Okay.
Q. All right. Then we go -- there's some other calls. There's a Mary Ann Moceri. Do you know Moceri?
A. Yes.
Q. Who is that?
A. One of my captains' wife.
Q. That's 10:36 p.m., right?
A. Okay.
Q. Your captain is calling you or his wife?
A. Yes.
Q. Was he working at that time?
A. No. He was home in New Hampshire.
Q. Do you know why he was calling you? Any idea?
A. No.
Q. Then at 11:01 you're calling this number, 837-4756. Do you know who that is?
A. No, sir.
Q. 11:26 you're calling 5838. It's registered to a Hunt.

Page 175

A. Yes.
Q. Who is that?
A. That's my ex-wife.
Q. Okay. 11:40 p.m. you're calling a number, 1312, registered to a Kevin Hunt. Do you know what that was all about?
A. The phone is registered to Kevin Hunt?
Q. Yeah, 284-1312.
A. Gotta be one of my cell phones. I have eight, ten cell phones.
Q. Did you give that cell phone to someone and you were calling?
A. My two daughters have cell phones.
Q. So you could have been calling one of your daughters?
A. That's one of my daughters.
Q. 11:42 p.m., you're calling your girlfriend, right?
A. Yes.
Q. It appears you get a machine. You got a one-minute call. Do you see that?
A. Yes.
Q. The next call, 12:43 a.m. is from Ziegler to Hunt. Do you see that?
A. Got it.
Q. It appears he got a machine, one-minute call. Do

Page 176

you see that?
A. Yes.
Q. Now, did you get that voicemail?
A. No.
Q. Never got it?
A. No, sir.
Q. Okay. 12:29 a.m., Tholander calling Hunt, again, a minute. Did you get a voicemail?
A. No, sir.
Q. So you never got a voicemail from Tholander at 12:29 a.m.; never got a voicemail from Ziegler at 12:43 a.m.?
A. No, sir.
Q. Okay. Now, from 12:46 you've got girlfriend calling leaving a message at 12:46; 12:47, the girlfriend calling leaving a message; 12:48, the girlfriend calling leaving a message; 12:49, the girlfriend calling. It says three minutes. 12:51, the girlfriend calling leaving a message; 1:06, the girlfriend calling leaving a message; 1:07, the girlfriend calling leaving a message.
A. I don't think she left messages.
Q. Well, they're one-minute calls. It means there's a connection.
A. It means she got my message. No need to leave a

Page 177

message.
Q. Well, all right. She got your machine. Maybe she didn't leave a message?
A. Right. I must have been in a beef. Something must have been going on.
Q. Okay. She's calling, she's calling, she's calling, she's calling. Right?
A. Right.
Q. But you're not talking to her?
A. Right.
Q. Were you asleep?
A. No.
Q. No?
A. No, sir.
Q. Okay. Not picking up the phone?
A. Not picking up the phone.
Q. Okay. 1:15 a.m. you call your voicemail. Do you see that?
A. Yes.
Q. And then 1:19 you're calling Ziegler. Do you see that?
A. Yes, sir.
Q. What that means, sir, is that you picked up your phone at 1:15 in the morning. You called your voicemail. You got Ziegler's message and you got

Page 178

Tholander's message, and you called back Ziegler, right?
A. No, sir.
Q. Okay. So this call at 1:19 a.m., four minutes after you picked up your voicemail, was just by happenstance to Ziegler?
A. No. The weather was getting bad.
Q. Look at the top.
A. The wind was blowing.
Q. Look at the timeline here.
A. And look at the rest of it. Exactly what I told you.
Q. 1:15 you pick up your voicemail. Do you see that?
A. Yeah.
Q. And it's right on your own phone records.
A. I see it.
Q. Okay. Four minutes. You're listening to your messages for four minutes. All right?
A. No.
Q. Well, it's on your -- it's on your records.
A. All right.
Q. It's on these records.
A. Okay. Go ahead.
Q. Okay. You're getting all your messages. You're hearing from your girlfriend who has left God

Page 179

knows how many messages, from Ziegler, from Tholander. Then what you do is you pick up the phone at 1:19 and you call Ziegler. Do you see that?
A. Yes, sir.
Q. And the phone call to Ziegler at that point --
A. Three minutes.
Q. Three minutes on your records. That's from Senesco's records. On your records it says four minutes. Okay?
A. Okay.
Q. Now, you've testified --
A. You told me everything else I've done. What did we talk about then?
Q. Well, you testified, and it's in the Counterclaim that you filed that you talked to Ziggy at 2:00 in the morning.
A. Yes.
Q. Does this refresh your memory?
A. Yep.
Q. You talked to him at 1:19, right?
A. Okay. 2:00 o'clock, 1:19. Go ahead.
Q. And that was after he had called you at 12:43 in the morning, right?
A. I didn't get his message. He didn't leave a

Page 180

message. Did he testify he left a message?
Q. Well, he certainly did.
A. Well, I didn't get no message.
Q. And Steve Tholander said he called you.
A. What were their messages?
Q. Come down here.
A. That's bull.
Q. That's bull. They're lying about that?
A. Absolutely.
Q. Okay.
A. Well, wait a minute, wait a minute. You think I'm the type of person who would not go down? Why wouldn't I go down? That's my company, man.
Q. You should have gone down, right, if you were --
A. Of course, I would have. I would have went right down there.
Q. If you were called to come down because your boats were getting banged up?
A. Right down.
Q. And if you were called to come down because you were breaking up the docks?
A. Right down.
Q. Okay. And that's what you would be expected to do, right?
A. Of course.

Page 181

Q. That would be your obligation?
A. Absolutely.
Q. Okay. When you called Ziggy at 1:19 a.m., he said everything was fine?
A. He said, "Kevin, the starboard corner is getting into some cement," which has happened before. "The starboard bits are underneath. It ain't bad." I said, "Zig, can you put a rope there, figure eight the rope like we done before?" He says, "Yeah, don't worry. I'll take care of it." I says, "Do you want me to come down?"
"No, man, we got it. Don't worry about nothing. We got it."
Q. So he was calling you at 12:43 a.m. to say things aren't bad; don't come down?
A. I never got a message.
Q. And Tholander, never got a message from him?
A. No, sir.
Q. So let's go through --
A. Sir, I wouldn't have any problem coming down there. I go down there all the time.
Q. So this conversation that took place at 1:19 in the morning with Ziegler, he said to you, "The starboard bits of the Patrick" --
A. Yes.

Page 182

Q. -- "are in the cement"?
A. Banging into the cement. The waves were banging it up against the dock.
Q. Now, the starboard bits of the Patrick --
A. Right.
Q. -- run from the deck up; is that correct?
A. Yes, sir.
Q. Are they in the bulwark?
A. Yes, sir.
Q. And what he was saying was they were banging the cement of the Senesco pier?
A. Yes, sir.
Q. And certainly it was not something that was supposed to be happening, right?
A. No, sir.
Q. Correct?
A. No, sir.
Q. I'm wrong?
A. What?
Q. Am I right or wrong?
A. Right.
Q. So he explained that was happening, right?
A. Yeah. I said, "Zig, you got it?" I said, "Wrap a figure eight, a rope around that and throw a tire on top of it after you do it."

Page 183

Q. So you recognized at that point in time that something had to be done with the lines, right?
A. With the ropes?
Q. With the lines.
A. No, nothing was breaking free.
Q. You said figure eight a line around it -- a rope around it. What are you talking about?
A. Figure eight a rope around the bit so when she hits the cement, she's just hitting the rope, instead of the steel into the cement.
Q. You knew that the steel shouldn't be hitting the cement?
A. That's correct.
Q. That was a potential problem?
A. It's done it before.
Q. It's a potential problem. It could hurt the tugboat or it could hurt the dock, right?
A. That's why we figure eight the rope there and we never had problems.
Q. Whose rope did you want him to figure eight there? Did you want him to take -- you wanted him to take one of the Hunt ropes, the lines, and figure eight it around the bit?
A. Yes, sir.
Q. And that was to prevent damage?

Page 184

A. Yes.
Q. So you assessed the situation, and you said do this, right?
A. Yes, sir.
Q. Ziggy, of course, was not your employee, right?
A. But he was there to take care of the equipment.
Q. He was there to take care of equipment, right?
A. Yes, sir.
Q. And Senesco had its own equipment there, right? They had a drydock?
A. Right.
Q. They had barges?
A. Tugboats.
Q. They had Boston Towing tugboats?
A. Yes.
Q. Sister company's tugboats, right?
A. Yes.
Q. And all of these -- all of that equipment was under its possession, custody and control, right?
A. Yes.
Q. Right?
A. Yes.
Q. It had an obligation, it being Senesco, to take care of its own equipment, just like Hunt had an obligation to take care of its equipment, right?

Page 185

A. Why did I get a bill for four line handlers?
Q. Well, we'll get to that one.
And you paid that, right?
A. What's that?
Q. You paid that?
A. No, they took it off.
Q. No, you paid that.
A. They took it off.
Q. Because you were happy to pay it?
A. What?
Q. Because you expressed --
A. Wait a minute.
Q. -- a willingness to pay it, right?
A. No, no, man. Wait, wait.
MR. COLLINS: Just answer the question.
A. I sat here long enough.
MR. COLLINS: Just answer the question.
A. Talk about paying bills. I used to wait for a year, one year to get paid from Senesco. So don't tell me about them paying bills to me or me paying bills to them.
Q. So then --
A. Are we done here?
Q. No, we're not even close to being done here.
A. Okay. Because, you know, you finally are getting

Page 186

to the point where you wanted to be. You wanted to get me upset, and I understand that.
So what I don't like in life is somebody calling me a liar. Okay? I don't lie. My little Irish mother, Agnes Hunt, told me you can trust a thief but you can't trust a liar. I don't lie. I didn't get those fucking calls.
MR. COLLINS: Let's take a break.
A. I didn't get those calls. I would have come down to my boat. I built this company myself. No one helped me, especially a little lawyer that don't know his ass from his elbow and never tied up a rowboat in his life.
Q. You don't scare me, you know that.
A. Oh, bullshit. You don't scare me. Come on. I'm not looking to scare anybody. I'm not looking to scare anybody. I'm sick of being called a liar.
Q. You can say what you want.
A. I'm sick of being called a liar, sir.
Q. If you keep intimidating me --
A. I'm sick of being called a liar.
Why? Because you're a big shot lawyer?
I don't like being called a liar. I don't call you a liar. Don't call me a liar. End of story. Don't call me a liar. I don't like it. I

Page 187

don't lie.
I would have came down. "Kevin, things are bad. Come on down here." Boom, I would have been right down there. End of story. No, let me go to bed. Let me just go to bed and let my boat get all destroyed. Come on.
(Whereupon, a brief recess was taken at 3:54 p.m., and the proceedings resumed at 3:55 p.m.)
THE WITNESS: I apologize for my outburst.
BY MR. ZONGHETTI:
Q. Okay. He tells you that a starboard bit is banging into the cement, and you tell him to wrap a line around the starboard bit?
A. Figure eight, figure eight a line.
Q. Did you call anyone from your company at that point in time?
A. There was no one to call at that time.
Q. You had no crew that was available?
A. No, sir.
Q. So if someone had to go down there, it would have been you?
A. Yes, sir.
Q. And you didn't go down there, right?
A. No, sir.

Q. Did you go to sleep?
A. No, sir.
Q. I'm sorry?
A. No, sir. I went to sleep around 3:30.
Q. Is there any reason you didn't drive down? You testified this is your business. No one helped you. You built it. It's your equipment. You have a guy on a dock --
A. One reason, sir.
Q. Let me finish my question. You have a guy on a dock who is saying your tug is -- the starboard bit is banging on the cement. You've told him to try and do something. You have no idea if it's going to work, right?
You had no idea if it's going to work, right?
A. What he was describing to me, it would have worked.
Q. Would have, should have? Should have worked?
A. No doubt about it.
Q. Obviously didn't work, right?
A. No.
Q. Did you think, "Hey, I better get down there to protect my investments"?
A. No one ever --



THE WITNESS: What's his name?
MR. COLLINS: Mr. Zonghetti.
A. Mr. Zonghetti, there's only one reason I didn't go down to that pier. He told me not to.
Q. Ziggy told you not to?
A. Told me not to, that they had it.
Q. Did you call him back like at 1:40 to see how it was going?
A. No.
Q. 2:00 o'clock?
A. No.
Q. 3:00 o'clock?
A. I thought -- actually, I thought my phone call was, like I testified, at 2:00.
Q. You thought wrong. And there's nothing --
A. It was at 1:19.
Q. What time did you go down there, ultimately?
A. I got there about ten minutes of 6:00.
Q. So you have five hours where you do nothing, right?
A. No. I made a phone call inquiring about the status of the equipment.
Q. 6:00 in the morning you call your voicemail?
A. About 20 past 5:00.
Q. Twenty past 5:00, what are you referring to?



A. I got up -- I laid down about 3:30. I got up to go to the bathroom about 20 past 5:00, saw my light flashing on my phone, hit it, and it said you have six or seven saved messages. And I knew there was problems right away.
Q. You know, Mr. Hunt, the funny thing about modern day society is there's records that show everything. And if you look at your phone records, you didn't make any phone call at 5:20.
A. No, I said checked my phone messages.
Q. You go from --
A. I checked my -- here it is right here. Here it is right here. 6:01 it says I checked my voicemail.
Q. So you go from 1:19 in the morning where you're given information that your tug is banging the dock till 6:00 in the morning when you call your voicemail, right?
A. Right.
Q. And at that point in time you now have one, two, three, four, five, six new messages, right?
A. (Witness nodding head affirmatively).
Q. Correct?
A. (Witness nodding head affirmatively).
Q. Yes?
A. Yes, sir.



Q. Okay. And all of those messages are from Senesco people, right?
A. Yes, sir.
Q. You have the president, Mike Foster?
A. 4:00 o'clock.
Q. You got Ziggy. You got Tholander.
A. 4:09.
Q. But those are after the messages --
A. That's after --
Q. -- that you had at 12:00.
A. That's when the shit hit the fan, at 4:00 o'clock.
Q. You have Tholander calling you at 12:30 at night.
A. No, sir.
Q. You have a conversation with Ziggy where he's telling you there's a problem, right?
A. Three minutes.
Q. It doesn't matter how long it was. He's telling you there was a problem. You're not calling him after that.
A. He's telling me everything is fine; stay in bed; go to bed.
Q. There's a Nor'easter that's come up. They're dealing with --
A. We're not --
Q. -- they're dealing with the Reinauer tugs in

drydock, the barges, and he's telling you, "Everything is fine" -- that's your testimony -- "go to bed"?
A. I'm just telling you what he told me.
Q. "Everything is fine. Go to bed"?
A. That's what he said. "We got it." That's what he -- that's what -- he said, "We got it."
Q. And you did just that, you went to bed?
A. Not right away. I couldn't go to bed right away.
Q. You went to bed ultimately, right?
A. Two hours, correct.
Q. Didn't bother calling back to try to talk to anyone at the pier?
A. I was sleeping.
Q. Now, you did go down there the next day, or that day, April 16th?
A. Yeah, of course.
Q. What time did you get down there?
A. Probably about -- I thought it was 6:00, but probably about quarter past 6:00.
Q. Well, 6:30 you're calling Ziggy still.
A. Well, I think I was calling him from the dock. I was there. I was there. I was there before -- when I was there, Mike Foster wasn't there. He came pulling in. I think he had left and went to



the main building. I think Ziggy went to the main building. I don't know.
Q. You got down there and you saw that Charlene had broken free?
A. Yes, sir.
Q. You saw there was damage to the tugs?
A. Yes.
Q. Damage to the dock?
A. Yeah.
Q. And you called your insurance company, right?
A. Not right away, no. I don't know what I did right away. Got the boats back to the dock and tied them up, that's what I did right away.
Q. Now, the Charlene was operable but damaged?
A. She was damaged, yes.
Q. Could she be used to work?
A. What's that?
Q. Could she be used to work?
A. She had engine problems, but she could start, yes.
Q. She didn't have engine problems because of the storm?
A. No, sir.
Q. Correct?
A. No, sir.
Q. Just so you know. I sometimes ask questions in a



negative. And if you answer, "No, sir," it creates a double negative. It can be confusing. So when I say, "Is that correct," I'm just trying to make sure it's clear on the record. Okay?
A. All right.
Q. You're not doing anything wrong. I'm probably asking the question wrong.
A. Just tell me what you want me to answer. I'll answer that way.
Q. She, Charlene, was able to work except for these engine problems that were not caused by the storm; is that correct?
A. She could run.
Q. Now, at some point in time did you come up with an agreement with ACE Insurance Company that you would have certain of your employees do work on the tugboats to try to repair them?
A. Yep.
Q. Yes?
A. Yes, sir.
Q. And I assume that ACE Insurance Company had to approve a rate for the men that you were going to use to work on your tugs?
A. Yes, sir.
Q. What was the approved rate?



A. I don't recall right now. We have the records.
Q. Were they daily rates?
A. They were hourly. I believe hourly. I could find out for you.
Q. Okay. I'm just going to have some stuff marked and go through it a little bit with you.
Let me ask you this. You testified, I believe, that you blamed -- after you had the conference out in the hallway with your attorney, that you did blame Senesco. And that the basis was that if they -- if Ziggy had told you to come down, you would have come down, and you could have saved the Charlene from breaking free, right?
A. That's correct.
Q. And I asked you if you had anything else, any other fault or anything. And you said no, that's it, right?
A. Well, I explained, you know, getting charged for four line handlers.
Q. Yeah, we're going to get to that.
But damage to, for example, the Patrick's starboard side, there was damage to that, right?
A. Yes.
Q. And that was not the fault of Senesco, right?
A. The fault of the storm.

Page 196

Q. Right. Not Senesco's?
A. No, I wouldn't say that.
Q. You would agree with that?
A. Yeah, I would say that it was banging the cement. It was the storm doing that, yes.
Q. So the fault that you have ascribed to Senesco, that related to the Charlene breaking free; am I correct?
A. What's that, sir?
Q. The fault you have, you have put on Senesco, you've ascribed -- I asked you did you fault Senesco. You said yes; if Ziggy would have told me to come down, the Charlene wouldn't have broken free; I could have put lines out.
A. Right.
Q. See what we're talking about then, if Senesco is to be at fault for something, would be damage caused to the Charlene after it broke free?
A. Yes.
Q. And do you know what damage was caused to the Charlene after it broke free?
A. Mostly steel work around fenders or bulwark, stuff like that.
Q. What part of the Charlene was damaged after it broke free, do you know?

Page 197

A. To the -- yeah, the stern areas, quarter areas on the stern pushed in, the bulwark pushed in, a lot of big dents, a lot of that.
Q. But do you know after it broke free, the Charlene worked itself into the pier, right?
A. Right.
Q. Bow first?
A. Bow first.
Q. Was anything hitting its stern?
A. Barges.
Q. Well, do you know --
A. The corner of the - the corner of the chemical barge, that was hitting the bulwarks. That's where it did most of the damage. We had to cut all that out. The whole bulwarks on the stern of the tug we did.
Q. Which side?
A. Both sides.
Q. Yeah, but the chemical barge wasn't hitting both sides.
A. Well, before she spun.
Q. It was hitting the Patrick, right?
A. Right.
Q. Before the Charlene spun and broke free it was hitting the Patrick?

Page 198

A. Right.
Q. So that wasn't Senesco's fault, right?
A. Well, if the ropes had been - everything had been tightened, I don't think everything would have been banging around.
Q. So now the problem is the lines were not tight enough?
A. Yeah. That's how they all started breaking.
Q. But it wasn't Senesco's fault to tend lines; it wasn't their obligation to tend lines.
A. There was four line handlers there.
Q. So now Senesco had the obligation to tend your lines?
A. They told me they would - they were going to.
Q. Who told you they were going to tend your lines?
A. Ziggy.
Q. You just told me the only conversation you had --
A. Ziggy told me, "We got it." Is there something I'm missing here? He said, "We got it, man. Take it easy. We got it, Bro. Relax."
Q. So that conversation was we're going to tend your lines? That included we're going to tend your lines?
A. We'll take care of the boats.
And Silvio with Mike Foster standing --

Page 199

well, away from me at the time, came up to me when I first got there. And he was half crying. Told me he could have saved the boats, he could have got on them. But Mike Foster said, "You jump on Hunt's boats, you're fired."
Q. Because that wasn't part of his job, right?
A. It wasn't part of his job? He jumped on all the other stuff. He jumped on -- those barges weren't all Senesco's. Those barges were customers'.
Q. So it's your position now that --
A. See what I'm trying to say though?
Q. Senesco was supposed to put people on your tugs that night?
A. If they told me they were going to put ropes out, I figured they're going to.
Q. The bottom line is you don't know what part of Charlene was damaged when. You can't say, right?
A. I can say between 2:00 and 6:00.
Q. Well, banging -- if the Charlene was banging against the Patrick and that caused damage, that's Senesco's fault?
A. Say that again?
Q. Charlene during the storm is banging against the Patrick because it was breasted to the Patrick, and that caused damage. Is that Senesco's fault?

Page 200

A. No, I would say that's not Senesco's fault.
Q. So if the Charlene was damaged in that -- or if the Patrick was damaged in that, because they were banging against each other during the storm, not Senesco's fault, right?
A. It was Senesco's fault not to throw some more rope out.
Q. Now they were supposed to throw rope out?
A. They couldn't have done that? They told me they were going to. When Zig says to me, "We got it, Kev. Go back to bed," what does that mean?
Q. What's an aftercooler?
A. Aftercooler?
Q. Yeah.
A. That's on the outside of the coolers that cool the engine.
Q. So it's a cooler outside of the engines?
A. On the outside of the hull.
Q. Let me show you this.
(Plaintiff's Exhibit 10 for I.D.: Invoice from D.N. Kelley & Son, Inc., Shipyard dated 10/02/07, Page 1)
MR. ZONGHETTI: It's marked as what? What sticker number is on there?
MR. COLLINS: 10.

Page 201

Q. That's an invoice from Kelley Shipyard, right?
A. Yes.
Q. That's for the Charlene?
A. Yes, sir.
Q. It's for cleaning an aftercooler on the Charlene?
A. Cleaning?
Q. Yes.
A. Cleaning aftercooler. That's what it says.
Q. That has something to do with the storm?
A. Sir, I didn't even know this took place.
Q. So that's new to you today, right, that that has something to do with the storm or not?
A. I would say no.
Q. Okay.
MR. ZONGHETTI: Can I have that marked, please.
(Plaintiff's Exhibit 11 for I.D.: Invoice from D.N. Kelley & Son, Inc., Shipyard, dated 10/02/07, Page 2)
Q. I show you Exhibit 11. It's another D.N. Kelley invoice?
A. Yes.
Q. Yes?
A. Yes, sir.
Q. Do you see there's an entry there, removing --

Page 202

crane to remove engine parts?
A. Yeah. This is stuff that we covered. That's what I talked to you about.
Q. Well, this is in the ACE Insurance Company file. Is that submitted to ACE Insurance Company?
A. What are you questioning?
Q. Well, for example, there's a charge there for a crane to remove engine parts.
A. Yeah, $500.
Q. Was that part of the -- was that caused by the storm?
A. No, sir. That's what I was telling you. Things like that I paid for.
Q. All right.
MR. ZONGHETTI: Can I have that marked.
(Plaintiff's Exhibit 12 for I.D.: Invoice from Marine Filtration Services, Inc., dated 8/17/07)
Q. This is an invoice from the insurance company file. And that's from Marine Filtration.
A. How much is this?
Q. $4,000 some odd. It has lube oil, things like that. Do you see that?
A. Yeah.
Q. That's not part of the --

Page 203

A. We paid this bill. I remember screaming about it.
Q. That's something that Senesco certainly wouldn't be responsible for, right?
A. No. But I remember screaming about it. We paid this bill.
Q. Not caused by the storm, right?
A. No. I paid it.
MR. ZONGHETTI: Can I have this marked.
(Plaintiff's Exhibit 13 for I.D.: Invoice from Seaport Communications Co., dated 9/21/07)
A. Hunt Marine accounts payable. Billed to Hunt Marine, LLC.
Q. Well, was there any reason to pass it on to your --
A. We didn't pass it on to our insurance company.
Q. How did it get in their file?
A. How do I know? They didn't pay us for it. I guarantee you that much.
Q. They shouldn't have, right?
A. No, they shouldn't have.
Q. Exhibit 13 is from Seaport Communications. It's an invoice, $8,000.
A. That's another one. They didn't pay this.
Q. Radar, right?
A. Where are you getting all this stuff, man?

Page 204

Q. Out of the insurance company file.
A. Yeah? Well, guess what? They didn't pay any of it. They shouldn't have any of it. These are our bills.
Q. But this was work --
A. This wasn't getting paid. This didn't get paid. As a matter of fact, I still owe them it.
Q. Right. That invoice date is what?
A. 9/21/07.
Q. What boat is that for?
A. Patrick Hunt.
Q. And that was while the boat was in shipyard?
A. No, sir.
Q. It was out by then?
A. 9/21? I guess it wasn't. But we didn't get -- the insurance company did not pay a penny of that, any of those bills.
Q. You have no idea why this was in the insurance company file or --
A. No, sir.
Q. -- why it was submitted to the insurance company?
A. No, sir.
Q. But certainly radar was not part of the storm?
A. No, sir.
Q. Same thing would go to an LCD monitor for the tug?

Page 205

A. A what?
Q. 15-inch monitor, LCD mount.
A. Let me see it. This is Seaport. None of this got submitted. None of this has nothing to do with the storm or any of that.
Q. All right. One of the many mysteries of the case, right?
A. Well, I'm going to ask my office about it, and I'm sure she's going to explain it to me. But first of all, I'm confident to say that Hunt Marine didn't give ten cents for any of that.
As a matter of fact, we still owe Manny money for that. And we paid -- we paid Mark the $4,000. I was upset about it, but the PML bill.
MR. ZONGHETTI: Can we have this marked, please?
(Plaintiff's Exhibit 14 for I.D.: Invoices from Hunt Marine I, LLC, to ACE Insurance Co.)
Q. I show you some documents. I'm just going to clip them together so we don't lose them.
Do you recognize those?
A. Yeah, these I recognize. These are the -- these were okayed by ACE for hiring the men.
Q. So those were invoices from Hunt Marine to ACE

Page 206

Insurance Company for men that worked?
A. Yes, sir.
Q. Okay. Can I just see those for a second?
The first invoice that we have here, 7/9/07, it's to ACE Insurance Company, care of Kevin Clarke. He was the surveyor, right?
A. Yes, sir.
Q. And this is something your company prepared and issued to the insurance company, right?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. And the concept here was that you were going to do some of the work on the tugs yourself; you were going to hire some of the guys, and the insurance company should pay for it since this was caused by storm, right?
A. They agreed to pay for it.
Q. And that was the idea here, right?
A. Because it was taking so long to get the boat out.
Q. Can you explain that to me, it was taking a long time to get the boat out?
A. Yeah, it was taking a long time to get the boat fixed and get back to work.
Q. And did you suggest to the insurance company that,

Page 207

"Hey, I can get some guys working on this and get it out"?
A. I said I had people working right now.
Q. And they should be paid to do it --
A. Right.
Q. -- by you?
A. (Witness nodding head affirmatively).
Q. Yes?
A. Yes, sir.
Q. You have project manager. And the rate was - goes by days, and the rate was $500 a day?
A. Right.
Q. Who was the project manager?
A. Alan. And I forget Alan's last name. Alan -- I'll get his name for you.
Q. Was he a crew member on one of the boats?
A. He's port engineer for Hunt Marine.
Q. So was he a salaried employee?
A. For Hunt Marine?
Q. Yeah.
A. At the time he got paid from ACE he was running the whole job.
Q. I understand that.
A. ACE hired him.
Q. Before he was hired by ACE was he someone that was

Page 208

a salaried employee for you?
A. No. Daytime employee.
Q. What does that mean, by the hour?
A. Yeah, daily.
Q. Daily. And what was his daily rate?
A. $450.
Q. So the negotiated rate with ACE was for $500?
A. Yeah, that was between them. I had nothing to do with that.
Q. And then you have on there manual labor, correct?
A. Mm-hmm.
Q. Yes?
A. Yes, sir.
Q. And it was based upon three men and based upon a number of days, right?
A. Months.
Q. It was days, 72 days?
A. That's two-and-a-half months.
Q. But the concept was you negotiated a rate --
A. Yes.
Q. -- for three men per day?
A. Yes.
Q. And that rate was what, $600 and --
A. Again, I can get you all that information.
Q. Well, it's right here on the invoice.

Page 209

A. Well, what's the rate? I don't know.
Q. The rates are $675, right?
A. A day? Okay.
Q. For three men?
A. Yep.
Q. Who were the three men that were working, do you remember?
A. I remember their first names. Dana was there. They switched sometimes. I'm trying to think of their names. I don't remember the last names. I just know their first names. Phil was one of the fellows.
Q. Phil Martin?
A. Yes, Phil Martin. Dana.
Q. Okay.
A. And I'm trying to think of his last name.
Q. Was there a Joe Viger?
A. No.
Q. Scanlon?
A. Yes.
Q. Stephens?
A. Yes. Stephens was one of them, yes, John Stephens.
Q. And when you represented to the insurance company that these people worked -- you had three men

Page 210

working for 72 days between April 17th and July 7th, that was accurate, right?
A. I believe so, yes.
Q. And you would have time records to back that up?
A. Yes, sir.
Q. Do you remember how much these guys were paid? They were paid by the hour, right?
A. I believe so, yes.
Q. Do you remember what they were paid an hour?
A. Twenty, I believe.
Q. Twenty dollars an hour?
A. I believe so.
Q. So there was built-in profit in this, right?
A. What's that?
Q. There was a profit built into this bill, these bills to the insurance company for Hunt Marine, right?
A. No. No. We were losing money like crazy, not having the boat out.
Q. Well, in terms of the men, if they were paid -- if they worked eight-hour days, right?
A. The shipyard charges $83 a man.
Q. I'm not asking that. Focus on what I'm asking.
A. We were saving the insurance company a ton of money.

Page 211

Q. Yeah. If they were paid $20 an hour, and they worked eight hours a day, and you had three men, right?
A. Yep.
Q. You were paying out $480 for a day, and you were charging $365 (sic) to the insurance company, right?
A. What are your numbers again?
Q. You said $20 an hour?
A. Yes.
Q. Eight-hour days?
A. Yes.
Q. A hundred sixty dollars --
A. Some of them worked 10-hour days. It varied.
Q. A hundred sixty dollars a man?
A. Yep.
Q. Comes out to $480, right?
A. Right.
Q. And you're charging $675.
A. I didn't make them bills up, sir.
Q. It's just good business, right?
A. And I didn't okay them.
Q. Did you look at this and say this is an opportunity for me to make some money here?
Big loss, right?
A. Huge loss. Huge loss. $500,000 worth.

Q. As of today, right?
A. As of the records.
Q. Just bear with me. I'm getting to the end, believe it or not.
Oh, a couple of things.
Do you remember coming in to meet with Gayle Corrigan in July 2007 and the context of the meeting was you wanted to -- you wanted to come back to Senesco to dock your boats there?
A. No. Actually, the meeting I had with Craig, Craig kept that open. Was that then?
Q. You do remember a meeting, right?
A. Yeah, but I don't think it was -- I didn't come specifically for the purpose of looking for dockage.
Q. What was the reason you came?
A. I don't really remember, to tell you the God's honest truth. I think it might have had something to do with the bills. But actually, Craig was actually the one who said, "Yeah, we'll talk. Are you looking for dockage?" In other words, he didn't -- you know, bypassed the situation and go on.
MR. ZONGHETTI: Can we have this marked, please.



A. But I didn't -- you know, I know better than that. I know that that wasn't going to happen. I could be wrong.
(Plaintiff's Exhibit 15 for I.D.: Invoice from Senesco to Hunt Marine Towing & Transportation, dated 4/18/07)
Q. All right. This is -- let me show you this.
This is actually a two-sided document. It's an invoice from Hunt Marine -- I mean from Senesco, dated 4/18/2007. Do you see it? There's some handwriting on it.
A. Yes.
Q. The invoice -- disregarding the handwriting, this was an invoice you got from Hunt for wharfage on the Charlene and the Patrick. Do you recall that?
A. Yeah, I see it.
Q. And they had charged you for line handlers on April 15th, 16th, during the storm. And they had charged you for forklift, right?
A. Yes.
Q. And do you remember that you objected to that?
A. Questioned it.
Q. Said you didn't want to pay it?
A. Well, I said they didn't do quite a very good job.
Q. So the concept was if they didn't do a good enough



job, you didn't have to pay?
A. Well, they offered to take it off.
Q. I'm not asking you that. You said to them you didn't want to pay for line handlers, right?
A. I never said I didn't want to pay for nothing. I said, "What is this?"
Q. Right. And they told you this is for the guys who were out there trying to save your boats?
A. Right. And I said, "Well, they didn't do a very good job."
Q. And did you say, "I'm going to pay it anyway"?
A. No. They said they would take it off.
Q. And they did take it off?
A. Yes.
Q. And did you pay that bill?
A. Yes.
Q. So if we look on the back, it shows the -- you have a credit, right? They took off the line handlers; they took off the forklift?
A. Yes.
Q. And you ended up paying $2,975?
A. Right.
Q. Okay. But the invoice I showed you earlier today for $6,244 -- I don't know which exhibit it is, but this is the one.



A. The one after I found out Senesco was suing me?
Q. Well, that was from before.
A. Oh, this is after I found out they were suing me. Okay?
Q. That was for --
A. And there's no rush, again. Okay? Which I pay my invoices on time. But I had a lot of past experience before Gayle came there -- Gayle is very nice -- getting paid, great difficulties. But I hung in there and still did the work.
I know, you weren't there. You don't know.
Q. The $6,200 invoice that we went through earlier today, are you -- are you now telling me you intend to pay it?
A. I have to look at it. I have to talk to my attorneys about it.
Q. Is there any reason that you haven't paid this, the $6,244?
A. I'm getting sued by you folks.
Q. Well, what does that mean? Did you get wharfage for your tugs in March and April of 2007 that you agreed to pay?
A. First of all, I agreed to pay for a certain length of the pier.

Q. Sir, you understand you've paid nothing on this invoice, right?
A. Let me ask you a question. When a barge comes in, and a barge eats up 300 feet of their wharf, they charge the barge 300 feet of the wharf. They don't charge how long - wide the thing is.
Q. Okay. So we're back to that one, the breasting. You didn't want to pay because you breasted the tug.
A. Well, if we had talked about it and they said, "Kevin, you have to pay," I would have said, "Okay. Let's talk about it." But they didn't say that.
Q. Okay. So we're back to the concept that whatever was said at the meeting is what governs?
A. We're going to argue about this now? We're here arguing about this bill?
Q. Did any management-level employee tell you that you could order Ziggy to tie up your boats during the storm?
A. No, sir.
Q. Did Craig Reinauer tell you that?
A. No, sir.
Q. Did Mike Foster tell you that?
A. No, sir.



Q. Did Steve Tholander tell you that?
A. That I could order Ziggy?
Q. Yeah, to take care of your boats.
A. No. Ziggy informed me they were there to take care of them.
Q. Yeah, but he's a guy who worked on the dock, right? Right?
A. Yeah.
Q. And we went through this.
A. Okay.
Q. You admit it. You said he couldn't bind the company, right?
A. Okay.
Q. Just like your deckhand can't, right?
A. Okay.
Q. Okay. But that's who you relied on during the storm, right?
A. Okay.
MR. ZONGHETTI: That's all I have.
THE WITNESS: Gayle, the bill --
MR. COLLINS: Hold on. We're still on the record.
THE WITNESS: Oh, I'm sorry.
As soon as this is over, I'll talk to you about that.



EXAMINATION BY MR. COLLINS
Q. Let me just ask a couple of questions.
I believe you indicated that you asked Ziggy to do a figure eight --
A. Yes.
Q. -- around the bit?
This was on the Patrick when you were talking to him at 1:19 --
A. That's correct.
Q. -- in the morning, right?
Can you describe what that would have done?
A. It would have acted like a rope fender, you know, like the bumpers we have on the side of the tug. It would have acted like that. And the rope would have just hit the cement.
Q. So would that have prevented further damage to the dock?
A. Yeah.
Q. Would it have prevented further damage to the Patrick?
A. Yeah.
Q. Do you know if Ziggy had ever done that for you on prior occasions?
A. No.



Q. He never had?
A. No.
Q. Do you know if he was capable of doing it?
A. Yeah, I described it to him. He said, "No problem."
Q. So you asked him to do a figure eight and --
A. Yeah.
Q. What was his response?
A. "Yeah, I got it."
Q. And that to you meant what?
A. He got it. I knew Ziggy pretty well. I mean, I just didn't know Ziggy like not knowing him. I knew the guy for three, five years.
Q. You knew that he could handle lines?
A. Yes. Sure.
Q. Had he tied up your boats before?
A. Yes, him and Silvio, yes, many times.
Q. In your mind he was capable of doing a figure eight?
A. In my mind Silvio and Ziggy were capable of handling everything down there.
MR. COLLINS: That's all I have.
MR. ZONGHETTI: That's all. Thank you.
(Whereupon, the proceeding was concluded at 4:37 p.m.)

STATE OF RHODE ISLAND,
ss. Providence, Rhode Island
COUNTY OF PROVIDENCE

BE IT KNOWN THAT I, Theresa A. Mullaugh, Shorthand Reporter and Notary Public, reported stenographically the foregoing deposition pursuant to notice at the time and place stated in the caption hereof; that I was then and there a Notary Public in and for the State of Rhode Island; that by virtue thereof I was authorized to administer an oath; that the witness before testifying was duly sworn to tell the truth, the whole truth and nothing but the truth; that the testimony of said witness was reduced to typewriting under my direction; that the foregoing pages contain a full, true and correct transcription of the notes of said deposition; that the deponent has not made the request to read and sign his deposition.

I FURTHER CERTIFY that I am not of counsel nor attorney for either or any of the parties to said action or otherwise interested in the event thereof, and that I am not related to either or any of the parties to said cause.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal of office this 3rd day of July 2008.

Theresa A. Mullaugh, RMR
Notary Public

My Commission Expires:
June 20, 2009